```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        22 CR 684 (JLR)

 5   BEVELYN BEATTY WILLIAMS,
     EDMEE CHAVANNES,
 6
                Defendants.              Conference
 7   ------------------------------x

 8                                        New York, N.Y.
                                          February 2, 2024
 9                                        10:20 a.m.

10   Before:

11
                     HON. JENNIFER L. ROCHON,
12
                                          District Judge
13
                           APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  EMILY A. JOHNSON
          MITZI STEINER
17        Assistant United States Attorneys

18   CALVIN H. SCHOLAR
          Attorney for Defendant Williams
19
     MIEDEL & MYSLIWIEC
20        Attorney for Defendant Chavannes
     BY:  AARON MYSLIWIEC
21
     Also Present:
22   Rasul Chew, FBI
     Isabel Loftus, Paralegal
23   Nina Eyres, Paralegal

24

25
```

1                (Case called)

2                MS. JOHNSON:  Good morning, your Honor, Emily Johnson

3    and Mitzi Steiner for the government.  We are joined at counsel

4    table by paralegal specialist Isabelle Loftus from our office,

5    and Special Agent Rasul Chew of the FBI.

6                THE COURT:  Good morning, everyone.

7                MR. SCHOLAR:  Good morning, your Honor, Calvin Scholar

8    for Ms. Bevelyn Williams, who is seated next to me.

9                THE COURT:  Good morning, Ms. Scholar and

10   Ms. Williams.

11               MR. MYSLIWIEC:  Good morning, your Honor, Aaron

12   Mysliwiec on behalf of Ms. Chavannes, who is next to me, and

13   also appearing at counsel table is paralegal Nina Eyres.

14               THE COURT:  Good morning, Mr. Mysliwiec and

15   Ms. Chavannes.  Good morning, Ms. Eyres.

16               We are here for a final pretrial conference.  I am

17   fairly comprehensive in my final pretrial conferences because I

18   like to prepare as much as possible for the trial in advance of

19   the trial.  Certainly there are limitations on that in a

20   criminal case, as opposed to a civil case, but there are many

21   things that we can take care of beforehand, and we will

22   endeavor to do so.  Insofar as there is anything that we can

23   take care of in advance in this case, please endeavor to do

24   that.  I will set aside times during the trial.  I'll go over

25   the timing.

 1                My general philosophy in trying a case is, if we are

 2      able to efficiently address something so that we are not

 3      slowing down the trial, that's what I'd like to do.  If you can

 4      proactively take care of something during a break, during the

 5      night before, during the morning of, I'll go through our

 6      schedule, but that's what I'd like to do.  Again, I know it's

 7      not always possible in a criminal case, but in large part it

 8      can be possible.  So if you know there is going to be an issue,

 9      let's talk about it in advance.  Let's really just try to

10      respect the jurors' time and keep the trial moving on a

11      schedule so that we can use their time wisely.

12                I have a list of things that I go over at a final

13      pretrial conference, but I'm also happy to go over anything

14      that anybody wants, so keep track if I don't cover something

15      you would like to cover.  We will do that as well.  We will

16      stay here as long as we need to today in order to do that.

17                Expectations and logistics first.  Try not to do any

18      speaking objections.  One- to two-word objections are fine.  We

19      are going to have limited sidebars, as I said.  Please try to

20      proactively raise anything that we need to raise.  If we need

21      to have a sidebar, obviously we will do it.  If there needs to

22      be further explanation, we will go to the side.  But let's try

23      to keep things moving in the trial.

24                We won't waste any of the juror's time.  So if the

25      trial day -- I will go over that in a moment -- ends at 4 p.m.,

1   we are going to go until 4 p.m.  If we finish a witness at

2   3:45, the next witness comes on at 3:45, and we do 15 minutes.

3   We are going to stick to the schedule that we tell the jury

4   that we are going to stick to, so please have all your

5   witnesses ready and have them ready to go one after the other.

6          Each side will have one of those little conference

7   rooms over there that you can use for the duration of the

8   trial.  There are two of them behind those doors.  You can set

9   up your things there.  Your witnesses can wait there.  They can

10  do their work, do whatever they need to do.  You can leave your

11  personal belongings there.  That space is yours for those two

12  weeks of trial.

13         Make sure that you arrange for your technology

14  walkthrough with our technology department before trial so that

15  you know how all the equipment works.  I understand that there

16  are videos, there are photos, there are lots of things that

17  just create technology issues for people, and I want to make

18  sure you work through all of those things before we get to

19  trial.  Our technology department is ready, willing, and able

20  to help you, so if you can make sure that you have your

21  run-through well before trial so that there are no glitches

22  during trial, that would be expected and appreciated.

23         Put in your orders for technology.  If you have an

24  order for a laptop or anything that you are going to need, make

25  sure you get those orders in so that there are no issues with

 1    bringing your technology in for the trials, for the trial days.

 2    There may be some days where I have something at a lunch break

 3    or at 4:00, so you may need to shift your items to the side of

 4    the table during lunch, or something like that, but, otherwise,

 5    you'll be able to leave your things here.

 6          That brings us to the trial schedule.  I generally do

 7    trials from 9 to 4.  And what I do is 9 to 9:30 is the time

 8    with the parties where we meet.  If there is any issue we need

 9    to talk about, we have time to talk about it there.  Anything

10    you anticipate is going to happen that day that we need to

11    discuss, anything from the night before that I need to give a

12    ruling on, we have that half an hour.  Then we start at 9:30.

13    We will have a midmorning break.  Then we will have lunch from

14    12:15 to 1:15.  We will have a midafternoon break and then we

15    will end at 4.  That gives us five hours of trial time per day.

16          My question to you is, given your time estimates in

17    this case, will that work for the two weeks I have set aside

18    for trial?  I was told that it's about an eight-day trial, and

19    I'm holding essentially nine days because that Monday is a

20    holiday, that's the Monday the second week of trial, so I have

21    nine days held.

22          With that trial schedule, with that time, do we think

23    that's ample time, Ms. Johnson?

24          MS. JOHNSON:  Yes, your Honor, I think that should

25    suffice.  Thank you for making your schedule clear.  That helps

 1   us.

 2          The only sort of question mark in our minds is the

 3   length of cross-examination, but we anticipate calling between

 4   10 and 11 witnesses, so I think it's likely that depending on

 5   the length of cross-examination, the government could rest in

 6   the first week or it may be very early in the second, just

 7   depending on that, and acknowledging that there will likely be

 8   two cross-examinations per witness.

 9          THE COURT:  I'm sorry, what?

10          MS. JOHNSON:  That there will likely be two

11   cross-examinations per witness.

12          THE COURT:  Mr. Scholar, how does that timing seem to

13   work from your perspective?

14          MR. SCHOLAR:  That sounds fine.

15          THE COURT:  Nine days seems like enough time.

16          MR. SCHOLAR:  Yes, Judge.

17          THE COURT:  Mr. Mysliwiec.

18          MR. MYSLIWIEC:  I agree with Mr. Scholar, your Honor.

19   I think it should be not a problem at all.

20          THE COURT:  Thank you.

21          MR. MYSLIWIEC:  I am just raising this, I don't think

22   it's going to be an issue.  I have Wednesday morning school

23   dropoff that's right at 8:15, 8:30 on the Upper West Side.  I

24   don't think it will be a problem for me to get here by 9 on

25   Wednesday mornings.  It's possible it might be 9:05 once.  I

1    just wanted to let the Court know of that issue, but I don't

2    think it will be an issue.

3          THE COURT:  Hopefully not an issue.  Thank you.

4          I will inform the jury when we are picking a jury that

5    it's going to be those two weeks, that we will block off those

6    two weeks, and that should be ample time.  Jurors always get

7    pretty antsy if they are here longer than they expect to be

8    here, so I want to make sure that we are absolutely sure that

9    that's our timing, and we are, so that's good.

10          As you can see, building into that schedule, we have

11   that 9 to 9:30 to talk.  We will have the breaks in the morning

12   and afternoon and then we end at 4.  Again, if there is an

13   issue that we need to discuss, we can discuss it at 4 p.m. as

14   well before the next day, so it should give us plenty of time

15   to be very prepared and to have a trial run smoothly.

16          The next item on my list is with respect to a plea.

17          Ms. Johnson, was a plea offer made to each defendant?

18          MS. JOHNSON:  No, your Honor.  There have not been

19   plea discussions, but we have submitted letters to counsel

20   outlining the government's view of the guidelines that apply in

21   this case.

22          THE COURT:  So there hasn't been an offer that was

23   declined?

24          MS. JOHNSON:  No.

25          THE COURT:  Thank you.

 1              Mr. Scholar, is that your understanding?

 2              MR. SCHOLAR:  That's correct, Judge.

 3              THE COURT:  And Mr. Mysliwiec.

 4              MR. MYSLIWIEC:  That's correct, your Honor.

 5              THE COURT:  Thank you.

 6              The next item I have on my list is the venue issue.  I

 7    will be charging largely standards regarding beyond a

 8    reasonable doubt.  Although, as everyone knows, the standard

 9    for venue is by a preponderance of the evidence, so that will

10    have to be included in the charge, unless the defendants wish

11    to waive that venue is appropriate in the Southern District.

12    So I ask only that question just because both standards would

13    otherwise be included in the charge unless there is consent

14    there.

15              Mr. Scholar, what's your position?

16              MR. SCHOLAR:  Your Honor, would it be possible to

17    speak to my colleague and get back to the Court about that?

18              THE COURT:  Sure, that's absolutely fine.  I fully

19    assume that jurors follow my instructions, so if I instruct

20    them that that standard applies only to venue, then they will

21    follow that, but I just wanted to raise that with you.

22              Mr. Mysliwiec, would you like to have a conversation

23    before you give me your opinion on that?

24              MR. MYSLIWIEC:  Yes.

25              THE COURT:  Take your time.  Talk about it.  Let me

1    know.

2          The next thing on my list is witnesses.  I assume we

3    are excluding witnesses who are scheduled to testify until they

4    testify from the courtroom.

5          Is that right, Ms. Johnson?

6          MS. JOHNSON:  It is, your Honor.

7          THE COURT:  Obviously, if it's a victim, a victim has

8    a right to be here, but I don't know if you have any of those

9    on your list.

10          Is that your understanding, Mr. Scholar?

11          MR. SCHOLAR:  Yes, your Honor.

12          THE COURT:  And Mr. Mysliwiec?

13          MR. MYSLIWIEC:  Yes, your Honor.

14          THE COURT:  Thank you.

15          The next item on my list is the witness list.  I have

16    the witness list from the government.  I would ask that the

17    government tell the defense their order of witnesses at least a

18    day in advance so that the defense can be ready for and know

19    which ones will be coming that day.

20          Will that be a problem, Ms. Johnson?

21          MS. JOHNSON:  No, your Honor.  We will certainly do

22    that.

23          Now might be an appropriate time just to flag for the

24    Court that many of our witnesses are not in New York.  So while

25    we will absolutely endeavor to tell the defense the order in

1    which we plan to call, we might have to do a few last-minute

2    shuffling just to accommodate for any travel emergency that

3    comes up.

4              THE COURT:  That's fine.  If you can endeavor to be as

5    professional with your colleagues in terms of letting them

6    know, that would be great.

7              MS. JOHNSON:  Absolutely.

8              THE COURT:  Thank you.

9              Mr. Scholar, will that work for you?

10             MR. SCHOLAR:  Yes, your Honor.

11             THE COURT:  Mr. Mysliwiec.

12             MR. MYSLIWIEC:  Yes, your Honor.

13             THE COURT:  I will get your name right eventually.

14             Exhibit list.  I have the exhibit list from the

15   government.  Any changes or issues with that?

16             MS. JOHNSON:  Not currently, your Honor, but we

17   anticipate marking a handful of additional exhibits, and we

18   will update the Court as soon as we do so.

19             THE COURT:  Thank you.

20             The next item is the jury selection process.  Let me

21   tell you how I conduct jury selection in a case like this.  I

22   am going to use the struck method, which is the method that's

23   set forth in my individual rules at section 6(f).  So I will

24   call the number of panelists computed by combining the number

25   of jurors selected and the number of peremptory challenges.

1              So in this case I am suggesting that I qualify a group

2       of 36 jurors.  I am going to suggest that we have four

3       alternates in this case, only because it's a two-week trial and

4       it's COVID time.  There could be people who get ill, etc., and

5       I just don't want to run out of alternates, so I'm thinking

6       that I qualify the 36 jurors, then the government will have its

7       six challenges, defense will have its ten challenges, which

8       they will split between the two, or however you want to handle

9       it, and then two challenges on each side to the eight

10      alternates, which will lead to our jury of 12 and our group of

11      four alternates.

12             Then what I do is, certainly we will remove people for

13      cause, if that becomes clear during our questioning, or after.

14      But, ultimately, we will end up with 36 qualified jurors

15      sitting there, and then we will do peremptory challenges.

16             I do peremptory challenges simultaneously, which means

17      that you will write down your peremptory challenges, bring them

18      and send them in to me.  If there are any overlap, then the

19      first 12 jurors will be seated, starting with the unchallenged

20      juror with the lowest number.  So if there is overlap and we

21      end up with 15 challenged panelists, the first 12 will be

22      seated and then the 13th juror, the uncharged juror with the

23      highest number, would also be excused, etc.  It's all in my

24      rules, but we will do simultaneous peremptories, and then we

25      will do separate peremptories for the alternates, same process,

1   two per side, and we will select the jurors from those with the

2   lowest numbers if there is overlap in the challenges.

3           Does this process work for you, Ms. Johnson?

4           MS. JOHNSON:  Yes, your Honor.

5           THE COURT:  Mr. Scholar.

6           MR. SCHOLAR:  Yes, your Honor.

7           THE COURT:  Mr. Mysliwiec.

8           MR. MYSLIWIEC:  Yes, your Honor.

9           THE COURT:  Great.

10          In terms of the voir dire itself, I will present the

11  overview of the case that was provided by the parties as part

12  of the joint voir dire submission.

13          Let me pause there and say I was very pleased with the

14  papers that were submitted by all parties in preparation for

15  this trial.  Things were organized, things were provided on

16  time, and things were provided in a very comprehensive manner,

17  so thank you all.

18          But I will read what was provided to me at ECF 78 at

19  3-4, and it's several paragraphs.  It starts with -- it's

20  called the charges and it goes from -- this is a criminal case

21  and it concludes with a description of Count One and Counts Two

22  and Three and ends with the counts alleged:  A violation of

23  Title 18, U.S. Code, Section 248.  I will say that to the

24  entire panel before I start voir dire selection as the overview

25  that they will receive regarding this case.

1          Are there any changes that I need to make to that

2     other than what has been submitted by the parties.

3     Ms. Johnson?

4          MS. JOHNSON:  I think just one edit from our

5     perspective, your Honor.

6          At the end of page 1, sort of three lines up where it

7     says, health facilities in Fort Myers, Nashville, Atlanta, and

8     Brooklyn, we don't anticipate presenting evidence about

9     Brooklyn, if the Court would like to strike Brooklyn.

10         THE COURT:  So the clause would say:  As well as in

11    the vicinity of reproductive health facilities in Fort Myers,

12    Florida; Nashville, Tennessee; Atlanta, Georgia --

13         MS. JOHNSON:  And Atlanta, Georgia.

14         THE COURT:  And Atlanta, Georgia.

15         I will do that.  Thank you.

16         Mr. Scholar, any changes to that joint statement?

17         MR. SCHOLAR:  No, your Honor.

18         THE COURT:  Thank you.

19         Mr. Mysliwiec, any changes?

20         MR. MYSLIWIEC:  No, your Honor.

21         THE COURT:  I will make that change.  Thank you.

22         The next item is the voir dire process.  So I conduct

23    the voir dire.  Certainly if at the end of voir dire the

24    parties think that another question should be asked of a

25    particular juror, follow-up question, I will hear you on that,

 1    but I will conduct the voir dire.

 2            My approach is to ask the first juror seated all of

 3    the questions in the voir dire that I have circulated to you as

 4    Court Exhibit 1, which we will go over in a minute, and then I

 5    will ask each subsequent juror whether they have any yes

 6    answers to the questions on the voir dire, and we will answer

 7    and address any yes questions that they have, and I'll proceed

 8    through the jurors in that manner.

 9            I have used my standard voir dire questionnaire, and I

10    added to it based on the parties' suggestions.  I have

11    included, I think, sufficient information to let the parties

12    intelligently exercise their for-cause and their peremptory

13    challenges.  I know there were a lot of questions, so I didn't

14    take all of them, but I took many, I believe, that the parties

15    were requesting.

16            Let me just make a few comments, and then I want to

17    hear if there are any objections or questions or suggestions

18    for what has been labeled Court Exhibit 1, and I have

19    circulated that to the parties in advance of today.

20            The first thing I wanted to say is that, generally

21    speaking, and I know this was something that was raised in the

22    voir dire suggestion, is if somebody answers a question in the

23    affirmative in Section C about some of the personal beliefs or

24    some of those things, I will follow up with, is there anything

25    about that experience, relationship, incident that would make

1     it difficult for you to be fair and impartial in this case?  So

2     know that I do have follow-up.  If there are sensitive answers,

3     I will take jurors over to sidebar and we will discuss those.

4               With respect to your request 52 to charge, know that

5     at the end of the voir dire process completely, I always ask

6     the following kind of catch-all question, which is, search your

7     conscience, it may be that I failed to put a question to you

8     that would touch upon your ability to be fair and impartial

9     juror, fair to the government, fair to the defendant.  Please

10    take this opportunity to ask yourself with care whether you

11    will be able to serve conscientiously, fairly, and impartially

12    in this case and to render a true and just verdict without

13    fear, favor, sympathy, or prejudice and according to the laws

14    as I will explain it to you.  If you have any doubt about your

15    ability to be fair in this case, please let me know right now.

16              So I do that at the end just to capture if there is

17    anything that's nagging in someone's mind that we have to make

18    sure that we get at.

19              Court Exhibit 1.

20              Ms. Johnson, any objections to it, to Court Exhibit 1?

21              MS. JOHNSON:  No objections, your Honor, but I have

22    three items to raise with the Court with respect to Court

23    Exhibit 1.

24              First, number 19, Ms. Bagliebter will not be present

25    at trial.  The government would just suggest removing her name

 1    from question 19.

 2              THE COURT:  Yes.  We will do that.

 3              MS. JOHNSON:  And then I know the Court just said that

 4    you have follow-up practices on Section C.  The government

 5    would just respectfully request, with respect to number 27,

 6    have you ever served as a juror, that the Court's follow-up

 7    include whether the jury reached a verdict without saying what

 8    the verdict was.

 9              THE COURT:  Yes.  Thank you.

10              With respect to that question, I generally ask, when

11    they served, if it was criminal or civil, if the jury reached a

12    verdict.  I certainly don't ask what it was.  And then I ask

13    anything about their jury service that would impact their

14    ability to be fair in this case.

15              MS. JOHNSON:  Great.  Thank you, your Honor.

16              Then one suggestion, which I flagged for the defense,

17    and I believe they are also amenable to it, is to add a

18    question in section B asking the jurors if they know any other

19    individuals in the venire because it occasionally happens that

20    individuals in the venire do know each over.

21              THE COURT:  Interesting.  OK.

22              Out of curiosity, let's say they do.

23              MS. JOHNSON:  It's happened to me twice, and we have

24    taken different approaches both times, just based on the

25    relationship of the individuals who know each other.

1          On one occasion it was neighbors, so we didn't take

2    any action, because there didn't seem to be any potential issue

3    with influence on a jury if you're neighbors.

4          On another occasion it was actually a doctor whose

5    like nurse was also in the venire.  Because they had a

6    boss/subordinate relationship, we felt it appropriate -- the

7    parties agreed that they couldn't be on the jury together, so

8    we just took the person off who had the highest number.

9          THE COURT:  Thank you.  That's helpful.

10         Anything else with respect to Court Exhibit 1?

11         MS. JOHNSON:  No, your Honor.  Thank you.

12         THE COURT:  Thank you.

13         Mr. Scholar, let me start with, do you have any

14   objection to adding the question, do you know any other

15   individuals who are here for jury duty?  I will figure out how

16   to phrase it.

17         MR. SCHOLAR:  Your Honor --

18         THE COURT:  Any objections or comments regarding Court

19   Exhibit 1?

20         MR. SCHOLAR:  Your Honor, may I have just one brief

21   moment?

22         THE COURT:  Sure.  Take your time.

23         MR. SCHOLAR:  Judge, I have had a chance to confer.

24   Question number 34 in section C.  Would it be possible for the

25   Court to remove serious crime and just leave it as crime?

 1          THE COURT:  Yes, fine.

 2          Anything else?

 3          MR. SCHOLAR:  That's it, Judge.

 4          THE COURT:  Let me ask Ms. Johnson, any objection to

 5  that?

 6          MS. JOHNSON:  No, your Honor.

 7          THE COURT:  Mr. Mysliwiec.

 8          MR. MYSLIWIEC:  Your Honor, the only edit I would

 9  propose would just be the spelling of my name, which I don't

10  think was your fault.  I think in the joint proposal we also

11  spelled it wrong.  What can I say.

12          THE COURT:  I can't say it and you can't spell it.

13          MR. MYSLIWIEC:  There you go.

14          It's M-y-s-l-i-w-i-e-c.

15          Since I think you're handing it to them as a written

16  document, it made sense to correct that.

17          THE COURT:  Absolutely, and I always just want it

18  correct, so thank you for pointing that out.  I will make that

19  change.

20          Any other changes to Court Exhibit 1?

21          MR. MYSLIWIEC:  No, your Honor.

22          THE COURT:  The next item is with respect to Court

23  Exhibit 2.  Those are the preliminary instructions that I give

24  to the jurors after they have been selected but before opening

25  statements so that they sort of know how to hear the evidence

1       that's going to come in, gives them a little overview, tells

2       them about their expected conduct.

3               Ms. Johnson, any objections or additions to Court

4       Exhibit 2?

5               MS. JOHNSON:  No, your Honor.  Just one clarification

6       on page 5.

7               THE COURT:  Yes.

8               MS. JOHNSON:  Section 4(c) about demonstratives.  The

9       government believes it's appropriate to include such an

10      instruction for the Court, but the government's proposed

11      demonstratives are likely going to be transcripts, the bulk of

12      them will be transcripts that are used as an aid to the jury.

13      They won't be admitted into evidence.  So we might want to

14      include transcripts in the description of items that are

15      being -- that the jury will be able to see to -- as an aid but

16      won't actually be in evidence.

17              THE COURT:  Tell me what they would be transcripts of.

18              MS. JOHNSON:  Videos.

19              THE COURT:  So they would not be admitted into

20      evidence.  They would simply be used as a demonstrative.

21              MS. JOHNSON:  Yes.  As an aid so that while they are

22      watching the video they have a transcript to reference.  We

23      typically do them in binders so the jury has them, and they are

24      instructed to turn to the page only when the video is shown.

25              THE COURT:  I will include transcripts into 4(c).

1           Anything else with respect to Court Exhibit 2?

2           MS. JOHNSON:  No, your Honor.  Thank you.

3           THE COURT:  Thank you.

4           Mr. Scholar, any objection to including transcripts or

5    any other objections or additions to Court Exhibit 2?

6           MR. SCHOLAR:  No, your Honor.

7           Actually, your Honor, under section 6, rules of

8    conduct, would it be possible to just instruct the jurors that

9    the counsel and the parties are not allowed to speak with them

10   or say hi or say good morning?

11          THE COURT:  Yes.  That's a very good one, and I think

12   I did that in my final instruction on page 9.  Can you see if

13   that works for you?

14          MR. SCHOLAR:  That's fine, Judge.  Thank you.

15          THE COURT:  OK.  Great.

16          Mr. Mysliwiec.

17          MR. MYSLIWIEC:  I have no objection to Court Exhibit 2

18   or any of the issues that were discussed.

19          THE COURT:  Great.  That will be what I go over with

20   them.  I say a few extra things about where they can get their

21   lunch, and everything like that, but that's the substance of

22   what they get from me before.

23          The other items with respect to the jury is, I do

24   allow the jurors to select their own foreperson, so you

25   shouldn't assume that it is juror number 1.  Although I do tell

 1   them that it is traditionally juror number 1, but they can

 2   choose whoever they wish, and I do allow the jury, as you saw,

 3   to take notes.  I don't allow them to ask questions during the

 4   trial, but I do allow them to take notes.

 5        Any other questions or issues with respect to jury

 6   selection, Ms. Johnson?

 7        MS. JOHNSON:  Your Honor, just two logistics issues

 8   with respect to jury selection.  On that day does the Court

 9   intend to sit until 4 p.m., or will the Court be sitting longer

10   on that day if we are close to picking a jury?

11        THE COURT:  I will sit as long as it takes to pick a

12   jury that day.

13        MS. JOHNSON:  And then should we also report to this

14   courtroom at 9 a.m. on Monday for jury selection?

15        THE COURT:  Yes.  I will begin jury selection as soon

16   as I get a jury.

17        Generally, on the first day, which is a Monday, many

18   of you probably know this, I'm learning this, they have to

19   watch a video, they have to do all sorts of things, so

20   sometimes it takes a while for them to get to us.  But as soon

21   as they get here, we will promptly start jury selection.  But

22   we will start at 9 in the event there are any issues.  If we

23   end up having some time to wait until we get the panel in,

24   that's fine, but we will start as soon as we get them.

25        What else should we talk about for jury selection?

1          MS. JOHNSON:  I just want to make certain I understand

2     the Court's process with respect to cause challenges.  Does the

3     Court address those juror by juror as something might come up,

4     or do we address them at the end, after you have gone through

5     the full 36?

6          THE COURT:  I give you both opportunities.  It may be

7     that we have someone at sidebar, and we have gone through a

8     colloquy, and it becomes clear that someone has a cause

9     challenge.  I will entertain that challenge then, or we may all

10    agree that it's appropriate to dismiss that juror for cause, so

11    it may well happen then.  And then, after I have the entire 36,

12    after we have them seated, I will say, are there any further

13    cause challenges or further questions you'd like asked of any

14    juror.  You'll have both opportunities.

15         MS. JOHNSON:  Understood.  Thank you, your Honor.

16         THE COURT:  Thank you.

17         Mr. Scholar, anything further we should discuss with

18    respect to jury selection?

19         MR. SCHOLAR:  No, your Honor.  Thank you.

20         THE COURT:  Thank you.

21         Mr. Mysliwiec, anything further?

22         MR. MYSLIWIEC:  If we finish picking on the Monday,

23    will we start the trial?

24         THE COURT:  Absolutely.  If we finish picking on the

25    Monday, and I usually -- this is a larger panel than I would

1    have in some civil cases.  If we can pick, I usually pick

2    juries in three hours or so, but we will see.  We will go

3    straight into my initial instructions, which we have just gone

4    over in Court Exhibit 2, and then we will go straight into

5    openings, and then after openings we will go straight into

6    witnesses, just depends how much time we have.  We will use all

7    the time until 4:00 at least.  If we are still picking a jury,

8    we will go longer in order to get that jury selected.

9             Any other questions regarding jury selection?

10            MR. MYSLIWIEC:  No, your Honor.

11            THE COURT:  Thank you.

12            That brings me to the motions *in limine*.  We are going

13    to discuss those now.  I think we are still good without a

14    break.

15            Let me first review defendants' motions *in limine*.

16            The first motion *in limine* from defense is that the

17    Court should exclude evidence regarding the New York City and

18    New York State mask mandate in 2020 during the COVID pandemic

19    because it is irrelevant, and, even if it is marginally

20    relevant, Rule 403 precludes admission because it is unfairly

21    prejudicial.

22            I have a response from the government that they do not

23    intend to introduce evidence of mask mandate or defendants'

24    compliance with local laws regarding masks, asserting that the

25    motion is moot, but that they do intend to introduce evidence

1    regarding the pandemic generally.

2           Mr. Scholar, because you moved based on the mask

3    mandate, the New York City and New York State mask mandate, is

4    there anything further I need to discuss with respect to that

5    motion *in limine*, or is it moot?

6           MR. SCHOLAR:  Judge, I would largely agree with the

7    government.

8           I would just ask, if possible, would the Court

9    consider giving a limiting instruction if the witnesses go into

10   the mask mandate or their regulations requiring a mask during

11   that time?

12          THE COURT:  I think they are not going to go into the

13   mask mandate at all.

14          But I will hear from you, Ms. Johnson.  What's your

15   intent with respect to the COVID and masks?

16          MS. JOHNSON:  Your Honor, Ms. Steiner and I split up

17   the motions *in limine*, so she is prepared to address this.

18          THE COURT:  Great.

19          Ms. Steiner.

20          MS. STEINER:  Your Honor is correct that none of the

21   government's witnesses will be asked to discuss the mask

22   mandate, so the government does not intend to elicit any such

23   evidence.

24          THE COURT:  Mr. Scholar, does that address your issue?

25          MR. SCHOLAR:  For now, Judge.

 1              THE COURT:  That's fair.

 2              Mr. Mysliwiec, any issue left on that motion?

 3              MR. MYSLIWIEC:  No, your Honor.

 4              THE COURT:  Thank you very much.

 5              Just so everyone is clear, the government will be

 6    introducing evidence of the COVID pandemic generally, that

 7    there were social distancing and the fact that the defendants

 8    didn't wear masks, but we just will not be introducing anything

 9    regarding the mask mandate under New York City or New York

10    State law.  That's my understanding and it seems that we have

11    agreement from everyone on that.

12              Ms. Steiner.

13              MS. STEINER:  Yes, your Honor.  Thank you.

14              THE COURT:  Mr. Scholar.

15              MR. SCHOLAR:  Judge just a question as to the not

16    wearing masks.  They are intending to present evidence of the

17    defendants not wearing masks.

18              THE COURT:  I presume that the videos or otherwise may

19    show that they are not wearing masks.

20              MR. SCHOLAR:  But not to argue that it's part of the

21    charges.

22              THE COURT:  That it's part of the charges, correct.

23              Ms. Steiner, can you address that.  I don't believe

24    they are going to argue that it's part of the charges in this

25    case.

1              MS. STEINER:  Your Honor, just to provide additional

2     context here, you are correct that the videos will show both

3     defendants without wearing masks or social distancing in

4     various circumstances.  I do expect the government will have

5     some witness testimony that that led them to feel threatened or

6     that their personal space was being encroached upon, so

7     certainly is necessary context for the government's case, and

8     so it will be referenced by the government to the extent that

9     it may have affected the extent to which these witnesses felt

10    threatened or encroached upon during these protests.

11             THE COURT:  Thank you.

12             Mr. Scholar, any further issues?

13             MR. SCHOLAR:  Judge, not for now, no.

14             THE COURT:  Mr. Mysliwiec, any issues?

15             MR. MYSLIWIEC:  Same answer as Mr. Scholar, your

16    Honor.

17             THE COURT:  Terrific.  Thank you.  I know it will seem

18    repetitious, but I want to make sure I get it from everyone.

19             The second motion *in limine* from the defendant is a

20    request that the Court exclude evidence that the defendants

21    altered a BLM, Black Lives Matter, mural in July 2020 asking

22    that it be excluded not only under 404(b), but also under Rule

23    403.  I understand the government has responded that they do

24    not intend to introduce such evidence and relayed that to

25    counsel, so this motion is also moot.

1            Is that correct, Ms. Steiner?

2            MS. STEINER:  That is correct, your Honor.

3            THE COURT:  Mr. Scholar, is there anything further on

4      that motion I need to decide?

5            MR. SCHOLAR:  No, your Honor.

6            THE COURT:  Mr. Mysliwiec.

7            MR. MYSLIWIEC:  No, your Honor.

8            THE COURT:  Thank you.

9            The next items I have are the government's motions *in*

10     *limine*.

11           The first motion *in limine* I have from the government

12     is that the defendants should not be permitted to use their

13     out-of-court statements because they are inadmissible hearsay,

14     and defendants have several arguments with respect to that.

15     They argue that a blanket rule excluding all of defendants'

16     out-of-court statements should be denied as premature and too

17     broad, given that we don't know what those statements are and

18     that defendants represent that they will certainly follow the

19     rules of evidence.

20           Second, the government has to be sure that information

21     that it submits has to meet other evidentiary rules, like Rule

22     401 and 403.  The statements of defendants may be admitted by

23     the defendants if they are not admitted for the truth but also

24     for another purpose, like the declarant's state of mind as well

25     as under a rule of completeness under Rule 106.  Essentially,

1    defendants argue that this motion is premature and that they

2    will follow the rules of evidence.

3            Is there anything further that you would like to add

4    with respect to this motion?

5            Let me ask you, Ms. Steiner, with respect to your

6    motion, you have now heard defendants' response.  What is your

7    response?

8            MS. JOHNSON:  Apologies, your Honor.  We are going to

9    be switching.

10            THE COURT:  Back to Ms. Johnson.

11            MS. JOHNSON:  No additional response from the

12    government.

13            I agree that this is something that's best assessed on

14    an exhibit-by-exhibit basis.  I think we have so far had a

15    productive dialogue with the defense, and we will certainly

16    endeavor to limit the issues that we tee up for the Court.  But

17    I think, to that end, if the defense can mark exhibits, then we

18    can start having a dialogue on if the government has any

19    objections to anything that they are going to seek to admit.

20            THE COURT:  OK.

21            I'll hear from the defendants.  Let me give you my

22    thoughts on this.  I do think -- let me hear from defendants

23    first before I give you my thoughts.

24            Mr. Scholar, anything you would like to add with

25    respect to your motion or your response to the motion?

1          MR. SCHOLAR:  No, your Honor.

2          THE COURT:  Mr. Mysliwiec.

3          MR. MYSLIWIEC:  Your Honor, I don't have anything in

4    terms of legal arguments to add.

5          I understand the government's point and, based on

6    reviewing the government's exhibits, I think we will be in a

7    position in the not-too-distant future to propose what we would

8    have as at least as some defense exhibits for purposes of this

9    kind of conversation.

10          Just so the Court and the government have a specific

11    example, with respect to say, for example, Government Exhibits

12    101 and 102, the government produced in discovery a video which

13    was labeled USAO-04944.  That video is about three minutes and

14    33 seconds long.  The government has taken out two excerpts

15    from that video.  One is 31 seconds.  That's Exhibit 101.  The

16    other is 46 seconds and that's Exhibit 102.  I think our

17    proposal on that will be to play the entire three minutes and

18    33 seconds rather than take out two snippets of it.  So that's

19    the kind of thing.

20          This is a video of what was happening on June 19, 2020

21    during the incident.  That's one of the key incidents that's in

22    the indictment and that we have obviously talked about in our

23    motion papers.

24          There are other statements that are being made, there

25    are other back-and-forth conversations going between our

1    clients and people who are associated with the clinic or other

2    people there on the sidewalk.  That's an example of the kind of

3    thing.  I just offer that for purposes of this discussion.

4            THE COURT:  Thank you.

5            I think that this is one of those instances where it

6    will be very helpful for the parties to discuss before and if

7    it turns out -- again, if I don't get a lot of advance notice,

8    that's OK.  But if I get some and it's at a break where you say

9    we are going to put in this video and they are allowed to put

10   in this or we have an issue with regard to this piece, let's

11   try to preview that.

12           But, generally speaking, I would have to have a very

13   good reason not to include an entire video, as opposed to just

14   a snippet of a video.  If there is a reason, you'll articulate

15   it, but it seems that if the defendants wish to have the entire

16   video played, I want to let you know, under a rule of

17   completeness, that may be my leaning.  Again, I want to see

18   what they are.

19           I certainly don't want anything to come in that's

20   overly long, wasting time, unrelated, those types of things.

21   If there is something certainly inadmissible in there, we will

22   deal with it, but, otherwise, you will bring those issues to

23   me.

24           Ms. Johnson, is there anything further with respect to

25   that motion then that we need to cover?

 1          MS. JOHNSON:  No, your Honor.  I think we will have to

 2    deal with it on a case-by-case basis.

 3          THE COURT:  Again, if you can do that proactively, it

 4    sounds like you have already talked about some of the videos,

 5    that would be appreciated so we are not wasting time while the

 6    jury is here.

 7          MS. JOHNSON:  Understood.

 8          THE COURT:  Thank you very much.

 9          The next **motion** *in limine* I have from the government

10    is that the defendants should be precluded from introducing

11    irrelevant, unfairly prejudicial, or otherwise excludable

12    evidence or arguments regarding several categories.  We are

13    going to take those categories in turn.

14          The first category that I have is the defendants'

15    personal circumstances, like those relating to family

16    background, health, age, motherhood, medical issues, or any

17    other similarly irrelevant personal factors that would be

18    presented simply to evoke sympathy.  That's the government's

19    motion at 5-6.

20          Defendants argue that this is premature and recognize

21    that they cannot seek to introduce evidence or argue to the

22    jury that they should sympathize with the defendants or equate

23    them based on sympathy or their personal backgrounds.  That's

24    at the defendants' opposition at 8, note 1.  But then there is

25    some discussion regarding character evidence, etc.

```
 1              I am not exactly sure what I'm being asked to rule on
 2      here.
 3              So let me hear from you, either Ms. Steiner or
 4      Ms. Johnson, about anything with respect to that portion of
 5      your motion, and then I'll hear from defendants.
 6              MS. JOHNSON:  Your Honor, I agree.  I think we take
 7      the defendants at their word that they will not seek to admit
 8      or make arguments that we flagged as improper here.
 9              With respect to the character evidence, I think that
10      kind of blends in better with another of the motions, which is
11      the point 3 and 4 in the government's motions, which Ms.
12      Steiner is addressing.  So I can turn over to her, and we can
13      address that next.
14              THE COURT:  Exactly.  That would be prior good acts,
15      essentially.  Yes.  Thank you.
16              Mr. Scholar, anything that you wish to add with
17      respect to your opposition to the government's motion regarding
18      evidence of family background, health, age, motherhood, medical
19      issues, or other similar issues?
20              MR. SCHOLAR:  Nothing further, Judge.
21              THE COURT:  Mr. Mysliwiec.
22              MR. MYSLIWIEC:  No, your Honor.
23              I think we rely on the papers as submitted for
24      purposes of a full discussion of this kind of evidence and what
25      we think is not proper and what we think would be proper.
```

1          THE COURT:  Let me give a few comments so we are all

2    on the same page.

3          First, I will be giving a standard jury instruction

4    that the jury shouldn't consider sympathy or bias in coming to

5    a verdict, so we have got that covered.

6          As I understand it, and I'd like confirmation from

7    defense counsel, they are not going to be admitting or arguing

8    things related to medical issues, health, or age.

9          Is that correct, Mr. Mysliwiec?

10         MR. MYSLIWIEC:  Yes, your Honor.  I mean, if

11   Mr. Chavannes testifies, she might testify how old she is, but

12   I don't think we are -- I think the key distinction is like the

13   argument we made regarding the case *U.S. v. Paccione*, where the

14   defendant sought to introduce that his then teenage son had

15   been born with cerebral palsy.  It was an obvious sympathy

16   play, I think, in that case.

17         We have no intention of doing anything like that in

18   this case or saying to the jury, oh, because Ms. Chavannes is X

19   number of years old or from this family background, you should

20   not find her guilty, even though the government proved their

21   case.

22         THE COURT:  Or is a mother.

23         MR. MYSLIWIEC:  Or is a mother.  That's not how we

24   would use that information.

25         THE COURT:  Thank you.

1              Mr. Scholar.

2              MR. SCHOLAR:  I would agree, Judge.

3              THE COURT:  Thank you.

4              The other item that was raised with respect to this

5    particular motion would be church membership.  I see the

6    government has raised that.  Certainly I think that it's going

7    to come up that the defendants have a role at the At the Well

8    Ministries.  It's in the indictment.  That's part of what the

9    government has placed in the indictment.  So that information

10   is going to come up.  Then I can evaluate things more fully

11   once I see what's been presented.

12             Before we get to the prior good acts, as I'll call it,

13   for the third part of this motion *in limine*, with respect to

14   character evidence, it would have to be relevant to a pertinent

15   trait, etc.

16             Do we anticipate that we are going to have character

17   evidence presented, Mr. Scholar, or do we just not know yet?

18   Or you don't have to relay it to me if you don't want to.  I

19   just wanted to know if there was anything I need to evaluate

20   now as to whether it's going to be appropriate or not.

21             Let me give you some context.  Obviously, if you are

22   in a fraud case and you are going to be bring in character

23   evidence about someone's truthfulness etc., I am just not sure

24   whether any of that is going to be at play here, and I just

25   wanted to know if there was anything we should discuss.

1          MR. SCHOLAR:  Your Honor, I am going to lean towards,

2    I don't know yet.  If that was the case, I would let the Court

3    know.

4          THE COURT:  Thank you.

5          Mr. Mysliwiec.

6          MR. MYSLIWIEC:  I think that's right.  I don't

7    anticipate putting on a witness that one would think of as a

8    character witness who testifies that, based on what's known

9    about a person's specific character trait in the community,

10   that that's good character evidence.  I just don't see us

11   putting on a witness for that purpose.  I think the government

12   in their motion may characterize some things as character

13   evidence, which I think we disagree with, it being character

14   evidence.  But, yes, a traditional sort of character-evidence

15   witness, I don't see that happening.

16         If we change our minds, we will certainly notify the

17   government and the Court as soon as possible.

18         THE COURT:  That's fine.  Great.  Because I am just

19   again noting Rule 404(a)(2) that has to be to a pertinent

20   trait, and I need to evaluate that.  Thank you.

21         The next part of that same motion is the government's

22   request that defendant not be allowed to introduce evidence of

23   defendants' potential punishment if convicted.  I see from

24   defendants' papers that they do not object to that and don't

25   intend to introduce that evidence.

1          Mr. Scholar, is that correct?

2          MR. SCHOLAR:  That's correct, your Honor.

3          THE COURT:  Mr. Mysliwiec.

4          MR. MYSLIWIEC:  Yes, your Honor, that's correct.

5          THE COURT:  Thank you very much.

6          Is there anything further for me to discuss or decide

7     with respect to that portion of your motion, Ms. Johnson -- Ms.

8     Steiner.

9          MS. STEINER:  No, your Honor.  The government would

10    believe, based on the representation from defense counsel, that

11    the issue is moot.

12         THE COURT:  Great.  I grant the motion to the extent

13    any would be introduced.

14         The next item of that motion is government's request

15    to exclude or preclude defendants from introducing specific

16    instances of noncriminal activities, like protesting outside

17    other healthcare facilities without using force or threats of

18    force or physical obstruction, their charitable works or

19    affiliations with religious groups, as well as stating anything

20    of the sort in their opening statements.

21         Defendants, as I understand, object to this exclusion

22    because it is relevant, in their view, to background

23    information, intent, and/or habit or practice under federal

24    rule 406.

25         Let me hear from the government, whoever addressed

1    that one, about your motion there, and then I'll hear from

2    defendants.

3          MS. STEINER:  Yes, your Honor.

4          From the government's perspective, this is a standard

5    404(b) request in the same fashion, that the government is not

6    permitted to introduce evidence to prove that a defendant acted

7    in a certain situation in accordance with prior bad acts.  So

8    too it's clear, under Second Circuit case law, as the

9    government laid out in its submission, that the defense is

10   equally prohibited from introducing evidence of good character

11   or good acts in other unrelated circumstances to prove that the

12   defendant acted in accordance with those good characteristics.

13         The defense's argument here, as your Honor mentioned,

14   I think, doesn't really address the core issue, which is the

15   404(b) issue.  They attempt to argue that potentially this

16   evidence could be used to establish a habit.  I think that's

17   clearly not applicable here.  It's not an involuntary habit,

18   whether one protests in one fashion or another.

19         The majority of the case law that is cited in their

20   motion references different circumstances; for example, where

21   the government is trying to prove that a defendant engaged in

22   ceaseless bad acts.  That's clearly not the government's theory

23   here.

24         Here the government is going to be establishing at

25   trial that there were certain circumstances at particular

1  protests over the life of the conspiracy during which time the

2  defendants engaged in this conduct.  So, again, that argument

3  would not be relevant.

4        For those reasons, the government would argue that

5  this evidence should be excluded.  If your Honor were to look

6  past even the 404(b) argument, certainly on a relevance ground,

7  it should be excluded on that basis as well, given, again, that

8  the government is only seeking to introduce evidence with

9  respect to particular protests and not the full breadth of

10  protests in which these defendants were involved over the

11  course of the conspiracy.

12        THE COURT:  Thank you.

13        I'll hear from defense, whoever would like to be

14  heard, or both.

15        MR. MYSLIWIEC:  Your Honor, I will go first, and then

16  if Mr. Scholar wants to add, I am sure he will.

17        First, I think 404(b) is the wrong place to start on

18  this issue.  As the Court is undoubtedly aware, in paragraph 3,

19  on page 2 of the indictment, it is alleged that, from about

20  2019 to 2021, defendants, quote, regularly protested in front

21  of a healthcare provider located in lower Manhattan.  The

22  indictment itself refers to regular protests, and in fact both

23  of our clients protested in front of this healthcare provider

24  many, many times other than June 19 and June 20.  It's already

25  been put front and center in terms of the government's

1   allegations.

2          In addition, I don't know how much 3500 material the

3   Court may have already looked at, but there are a number of

4   witnesses who, in their 3500 material, talk about being

5   familiar with our clients based on other protests, their

6   awareness of them, their ability to identify who they are.

7   It's going to be a natural piece of what should be fair

8   cross-examination, other instances where they have dealt with

9   our clients.  So evidence of regular protests is therefore

10  already in the case based on what the government's evidence is

11  in the case.

12         I would submit that evidence regarding defendants'

13  broader activities should be admitted because it puts the

14  evidence in context here and completes the story of the crime

15  on trial.  To that point we cited *United States v. Sheffield*,

16  which is an Eleventh Circuit case.  Obviously, we are in the

17  Second Circuit, but I think that the analysis there is helpful.

18         Here, evidence regarding these regular protests is

19  admissible because it puts in context what happened on June 19

20  and June 20 with respect to the Manhattan healthcare provider

21  and also allegations about what happened at other protests in

22  other states.

23         It's also --Let me pause you there, Mr. Mysliwiec.  In

24  *Sheffield*, isn't that a different kind of case?  In *Sheffield*,

25  they were deciding whether the person was making molds for his

1    own benefit.  They were molds for fishing lures.  Being from

2    Michigan, I know fishing lures.  They were making mold for

3    fishing lures, and the charge was they were doing it for their

4    own benefit.  The other information came in that the air force

5    base allows you to make those lures for gifts and, therefore,

6    that shows that he may not have been making them for his own

7    benefit.

8            That doesn't seem to me at all to be the same as the

9    argument that a defendant didn't use force at one protest and,

10   therefore, that's relevant to whether they used force, for

11   example, at this protest.

12           MR. MYSLIWIEC:  I think that the *Sheffield* facts are

13   different in nature or different specifically from the facts

14   here, obviously.

15           But let me phrase it this way.  I think part of the

16   defense here is that -- I'll speak for Ms. Chavannes rather

17   than both defendants.  She protested regularly outside of

18   healthcare providers, and she did so with an intent to get

19   across her point of view about specifically whether people

20   should have an abortion or not.  That's the most direct thing

21   that she was protesting about.

22           It's our contention that the other evidence of the

23   regular protest activities is evidence that completes the story

24   about what her intent was when she went out and protested at

25   these places, including on June 19 and June 20, for example, to

1    take one specific thing that's alleged.  And then there were

2    circumstances at the clinic itself that changed how that

3    protest unfolded, things which I am not going to get into

4    today, but make it distinctive.  And in order to complete our

5    defense, I think it has to be understood in the context of

6    their regular protest activities that the government has

7    alleged about in the indictment.

8            We are not going to make the argument, oh, because

9    Ms. Chavannes protested in a, for lack of a better word, good

10   and proper way, on 99 other occasions, the jury should excuse a

11   violation of the FACE Act on the hundredth location.

12           What we are saying is, the method of protesting on the

13   other 99 locations is circumstantial evidence that shows

14   Ms. Chavannes' intent when she would go to clinics and advocate

15   for her viewpoint.  To the extent that something happened

16   differently on a given day, it's within that context and

17   relates to the kind of explanations and arguments that we are

18   going to make about why that day was different and why there

19   were some additional activities that the government points to

20   as, look, here there was a physical altercation, or here there

21   was a forceful interaction that caused someone who was either

22   with the clinic or trying to get into the clinic to back up and

23   lean against a metal barricade.  Those things didn't happen on

24   other days.  They happened on June 19 and/or June 20.

25           But without that additional context, I think the jury

1   won't understand why that day was different, how it got to that

2   point, and the fact that, in Ms. Chavannes' mind, when say she

3   confronted someone within the metal barricades and they backed

4   up and leaned over, she wasn't doing it with an intent to

5   intimidate, interfere, or the other kinds of elements that are

6   part of the FACE Act.

7          THE COURT:  Let me ask a few more questions, if you

8   don't mind.

9          Why would it be relevant what she did -- you can

10  always argue, and I assume you will, that your client's actions

11  were a result of physical altercations which perhaps somebody

12  else started, that there were metal barricades there that

13  required a certain type of conduct, whatever the arguments are

14  going to be with regard to why the activities were what they

15  were on the offense dates in question.  Why would it matter

16  that perhaps there was not a metal barricade two years earlier

17  at another protest?

18         I am just not understanding why we could have all

19  sorts of evidence regarding other protests that they did that

20  didn't have a metal barricade that maybe didn't have a physical

21  altercation with the person, whatever it is.  Those are

22  distinct and different circumstances.  I am not precluding you.

23  I wouldn't be precluding you from talking about the issue at

24  hand here.  But how would those other protests impact or be

25  relevant to the assessment of what happened on those particular

1    days?

2            MR. MYSLIWIEC:  Your Honor, if that was the fact, that

3    we just wanted to bring in one thing about a protest that

4    happened two years earlier, I agree with the Court that I don't

5    know it's all that probative in that situation.

6            But here we are talking about protests that were

7    occurring like almost on a weekly basis or sometimes on a

8    weekly basis.  There was advertising about them to various

9    groups and various groups did that.  And then there were many,

10   many times, there were no metal barricades at all when people

11   showed up to protest, and then on June 19 and June 20 it was a

12   different circumstance.

13           I think relevance is always contextual.  The factual

14   hypothetical that your Honor posed, I would agree with you, I

15   don't think that's very probative to bring in something that

16   happened two years before.

17           To bring in a pattern or regular protest activity, as

18   the indictment itself describes, and illustrate what that

19   regular protest activity is I think is much more probative than

20   the example that the Court posed.

21           THE COURT:  Thank you.

22           Mr. Scholar, anything you would like to add, please?

23           MR. SCHOLAR:  No, your Honor.  I think that argument

24   also covers Ms. Williams' thinking as well.

25           THE COURT:  Thank you very much.

1              Ms. Steiner, any response?

2              MS. STEINER:  Just briefly, your Honor.

3              With respect to defense's discussion of the

4     indictment, the government would introduce evidence through its

5     witnesses that they were aware that these defendants had

6     protested at their facilities previously in large part to

7     establish how they can identify these individuals and why they

8     have knowledge of kind of their activity more broadly.

9              So the government would introduce that for a much more

10    limited purpose than what defense is proposing here, which I

11    think, in the way they are describing just now, clearly points

12    to a propensity purpose to show that on one day, for example,

13    there was a metal barricade, and they may have behaved

14    differently than on another day where they behaved lawfully.

15    That's exactly the type of propensity argument that would be

16    inappropriate and also not relevant for the reasons that your

17    Honor has articulated.

18             THE COURT:  Other than having a witness say, I can

19    identify this defendant because I came in contact with this

20    defendant on another date, are you going to get into any more

21    detail than that about the particular other incidents?

22             MS. STEINER:  Your Honor, I expect that witnesses may

23    also testify that they had particular concerns about the

24    defendants based on their prior interactions that may have

25    escalated on this date, but certainly it wouldn't be

1    referencing other good acts of the defendants in the sense that

2    they were protesting lawfully on other occasions.  We are not

3    going to get into the details of the other particular

4    occasions.  It would more get to the state of mind of these

5    particular witnesses when they are preparing for what occurred

6    here, which was these defendants to be protesting at these

7    facilities.

8              THE COURT:  If you were to elicit, for example, that a

9    witness knew, let's say Ms. Williams, from an event that

10   happened on -- I'm picking a date -- August 1, 2019, would you

11   have any objection to the defendants eliciting what occurred

12   actually on that event, even if it is, in your view, a prior

13   good act?

14             MS. STEINER:  Certainly, your Honor, if the government

15   opened the door through its witnesses, we would be open to

16   reconsidering it.  But as I have indicated, I do expect that we

17   would keep our witnesses' testimony directed at identification

18   and state of mind.

19             THE COURT:  Thank you.

20             Mr. Mysliwiec.

21             MR. MYSLIWIEC:  Your Honor, I don't think we object to

22   the government asking its witnesses those kinds of questions.

23   I think that highlights the relevance of the prior familiarity

24   and interactions with, in my case, my client, Ms. Chavannes.

25             There is a whole context within which -- again, just

1    focusing on the Manhattan health clinic, there is a whole

2    context within which these interactions occur on June 19 and

3    June 20.  It's in the existence of essentially a prior

4    relationship and a prior interactions between people from the

5    clinic and Ms. Chavannes and Ms. Williams and others who are

6    there protesting as well.

7            I think in this case, because it's so integrally

8    related, it actually doesn't tell the complete story from which

9    the jury should make the final factual determination of whether

10   or not there is a violation of the FACE Act, pure and simple.

11           THE COURT:  Thank you.

12           We have been going about an hour and a half.  I want

13   to give our court reporter a break.  I'll come back and rule on

14   this.  Why don't we take a 15-minute break.  We will come back

15   at 11:40, and we will continue with the motions *in limine*.  We

16   are adjourned until 11:40.

17           (Recess)

18           THE COURT:  One other item with respect to that

19   particular portion of the motion that we didn't really talk

20   about, we talked about sort of the prior good acts of -- I'm

21   using shorthand -- prior good acts of protests that didn't

22   involve alleged violations here.

23           But the other portion of that motion was the

24   defendants introducing evidence of the defendants' charitable

25   work or affiliations with religious or social organizations

1    other than —— I presume At the Well Ministries can come in,

2    since that has been placed in the indictment.

3            But given our discussions before, is there anything

4    further we need to discuss with respect to that part of the

5    motion, Ms. Steiner?

6            MS. STEINER:  No, your Honor, not from the government.

7            And if I could briefly be heard on the issue we

8    discussed before the break, I just had a comment to put before

9    the Court.

10           THE COURT:  Yes.  But let's not go there just yet.

11           MS. STEINER:  Of course, your Honor.

12           THE COURT:  Mr. Mysliwiec, do you intend to go into

13   their charitable works or affiliations with other religious

14   organizations, or anything like that?

15           MR. MYSLIWIEC:  Nothing comes to mind on this.  There

16   are some other organizations that had protesters out there that

17   day.  It's possible that one of them may end up being a witness

18   in the case, but there wouldn't be testimony for what could be

19   an improper purpose, like, oh, because Ms. Chavannes has given

20   to these charities that help orphans, you should take that into

21   account.

22           THE COURT:  Or because she is a religious woman you

23   should take that into account.

24           MR. MYSLIWIEC:  We are not going to make that kind of

25   argument.

1              THE COURT:  Mr. Scholar.

2              MR. SCHOLAR:  Agreed, Judge.  We are not going to make

3    that kind of argument.

4              THE COURT:  Ms. Steiner, is there anything else that

5    we need to address with respect to that part of the motion?

6              MS. STEINER:  Briefly, your Honor, with respect to the

7    good acts that I mentioned earlier, is that what you are

8    referring to?

9              THE COURT:  No.

10             MS. STEINER:  Nothing further on this matter.  Thank

11   you.

12             THE COURT:  Now going over to the prior protests, what

13   else did you want to add?

14             MS. STEINER:  Your Honor, prior to the break, the

15   government had clarified for the Court that we intended to

16   elicit testimony about prior protests the defendants were

17   involved in, only to the extent of providing witnesses the

18   opportunity to identify the defendants, as well as to speak to

19   their state of mind.

20             I think at this point, to simplify matters, the

21   government would be prepared to limit the testimony it elicits

22   to identification purposes and perhaps a follow-up question of,

23   how do you know these defendants?  A very generic from prior

24   protests, I presume, would be the answer for most witnesses.

25   And to kind of cabin things there.  I think that would be

1    sufficient for the government's purposes in this matter.

2            THE COURT:  Thank you.

3            Mr. Mysliwiec, if they do not elicit testimony

4    regarding the state of mind of their witnesses, meaning based

5    on the interactions that they have had with your clients

6    previously, and only to identify them, I know them from a prior

7    protest, period, what is your response then as to why prior

8    good acts would need to come in?

9            MR. MYSLIWIEC:  Your Honor, I think it's the same

10   argument I made before.  I think that the government wants to

11   cabin this into sort of -- and I'll make a different analogy

12   for purposes of the kind of arguments I think are occurring

13   here.

14           I find it often the case that the government likes to

15   have a trial that's about zooming into very small pieces of

16   evidence.  And the defense argues, you can't take just that

17   small zoomed-in frame out of context of a larger picture.

18           The most obvious way to describe this is, in a typical

19   self-defense case, the government likes to focus -- I am not

20   saying these particular prosecutors, but prosecutors often like

21   to focus on the moment that my client may have stabbed the

22   person, leaving out that before that there was a knife fight

23   between the two of them and the other person tried to stab my

24   client five times.  That's obviously relevant context type of

25   evidence.

 1              Now, this isn't a self-defense case, but it's the same

 2     kind of issue.  These witnesses know my client from prior

 3     interactions.  The indictment says regular protest activity.

 4     It alleges a large period of time of conspiracy.  The way that

 5     these people know my client is obvious cross-examination

 6     territory.  Even if it's not for, say, regular protests, it's

 7     for bias, motive, absolute crystal clear areas of cross.  I

 8     don't mean like necessarily biased about the kinds of people or

 9     who my client is, but bias in the way the law defines it, that

10     witnesses can have a bias or motive for their testimony.

11              The fact that they have had prior interactions with my

12     client is just natural territory to get into.  It has to do

13     with other protest times.  It has to do -- I think if your

14     Honor has seen some of the 3500 material, the idea that

15     Ms. Chavannes was loud, that she was angry, that she was in

16     closer physical proximity to some of the people at this clinic

17     than other people who would come and protest the activities of

18     the clinic.

19              That naturally leads into the final issue that's

20     discussed in these motions *in limine* where it's clear -- I

21     think it should be clear, our entire defense here is that there

22     was an intent to be loud, angry, all those other kinds of

23     things, to get out their viewpoint and persuade other people to

24     listen to them and change their minds about what kinds of

25     things they wanted to do.

1          The government's point is, no.  Their intent was to

2     intimidate, interfere, obstruct, and even attempt to injure, a

3     classic type of trial case where the jury will be asked to

4     decide which intent is what happened here, putting aside the

5     burden of proof for a moment, but essentially a question that

6     they will have to decide.

7          I don't think it's fair for the government to put on a

8     witness who has a lot of prior interaction with my client and

9     say, do you recognize this person, and that's period, end of

10    the story.  I think that those other instances and other

11    interactions are a key piece of evidence in the case so that

12    the jury can understand the full nature of the relationship,

13    the full story and the full context for then judging these

14    specific acts that the government included as sort of the key

15    highlights of the conspiracy.

16          THE COURT:  Before you sit down, I somewhat understand

17    if the defendant or if the government was going to bring out

18    state of mind, for example.  But talk to me more about how

19    their prior interactions with your client would be relevant to

20    bias or motive.  Again, I don't want us to get so far afield

21    that we are talking about -- we are getting into waste-of-time

22    jury confusion, all of those other incidents that are not at

23    issue in this case.  I want to see how it is relevant to the

24    issue in this case to bias or motive, which are the ones that

25    you relayed.

 1                MR. MYSLIWIEC:  I mean, again, like bias and motive,

 2      as broadly defined under say *Davis v. Alaska*, that they have

 3      had prior interactions.  They don't like Ms. Chavannes.  They

 4      don't like the things that she has been saying.  They stand on

 5      a very different -- have a very different political perspective

 6      about what's appropriate, what's lawful, and that their

 7      knowledge of her and her opinions and the way she expresses

 8      those opinions and the way she has done it on prior occasions

 9      are relevant as cross-examination material for getting at,

10      again, bias broadly defined or motivations of the witness on

11      the stand in terms of how they tell their story.

12                THE COURT:  Thank you.

13                Ms. Steiner, can you address that, why they wouldn't

14      be able to elicit on cross if the witness had prior

15      interactions with their client in order to establish whether

16      there is any animosity or bias with respect to their client.  I

17      am not saying introducing the whole world of has she ever

18      protested before and getting into every single protest that has

19      happened before.  I am talking about interactions that your

20      witnesses have had with these defendants to elicit whether

21      there is any sort of animosity with respect to these clients or

22      these defendants.

23                MS. STEINER:  Your Honor, I don't believe that if the

24      Court were to grant the government's motion here it would

25      preclude the defense from asking government witnesses about

1    their prior relationship with their clients.  They would be

2    limited in terms of what arguments they could make about the

3    fact that their clients had engaged in legal activity in these

4    prior protests, so that would be something that they would have

5    to consider, but it wouldn't hamper them from appropriate

6    cross-examination.

7         With respect to what counsel mentioned earlier about

8    the government's indictment, to the extent that there is any

9    potential jury confusion there, the language that counsel is

10   referencing is in the overview language of the indictment, not

11   the statutory language.  I don't know if it is your Honor's

12   practice to send the indictment back to the jury.

13        THE COURT:  It is not.

14        MS. STEINER:  Then that issue is not one we have to

15   discuss further.

16        THE COURT:  Thank you.

17        Let me rule on this.  Thank you for your patience.  I

18   am going to rule on the record, as opposed to issuing a written

19   opinion.  I think it's more expedient that way, but I'll give

20   you my full ruling.

21        A defendant may not introduce evidence of prior lawful

22   conduct or good acts in order to prove that they did not act

23   unlawfully with respect to the charged offenses.  The Second

24   Circuit held in *U.S. v. Dawkins*, 999 F.3d 767, 792, (2d Cir.

25   2021) that "a defendant may not seek to establish his innocence

1    through proof of the absence of criminal acts on specific

2    occasions."

3         Just as defendants' prior bad acts cannot be

4    introduced to show that she committed the crime charged, the

5    Second Circuit guided that "such good-acts evidence is only

6    relevant if we assume that a defendant acted in conformity with

7    those prior good acts, i.e., if we make the exact propensity

8    inference, Rule 404(b)(1) is designed to prohibit."  The Second

9    Circuit cited numerous cases in support, including *U.S. v.*

10   *Benedetto*, 571 F.2d 1246, 1249-50 (2d Cir. 1978); *United States*

11   *v. Connor*, 580 F.2d 38, 43 (2d Cir. 1978).

12        Defendants do not seriously contest this general rule

13   of law.  They say instead they are not attempting to introduce

14   the good acts or propensity evidence or a single occurrence of

15   lawful conduct in order to establish innocence through proof of

16   the absence of criminal acts on specific instances.

17   Defendants' opposition brief at 12.  Instead, they seek

18   admission on other grounds, and I will address them.

19        Defendants argue that they should be permitted to

20   introduce evidence of prior instances where defendants

21   protested outside reproductive healthcare facilities without

22   use of force or threats of force or physical obstruction to

23   show that they lacked intent to commit the crimes here or to

24   complete the narrative, which would address their state of

25   mind.  Opposition brief at 13.

1          The Court does not agree.  Defendants are seeking to

2     introduce evidence of prior peaceful protests to show that

3     defendants did not intend to act unlawfully at the protests at

4     issue in the indictment.  This argument is just dressing up a

5     propensity argument.  *See U.S. v. Chambers*, 800 Fed. Appx. 43,

6     36 (2d Cir. 2020) ("Chambers' argument that his running of a

7     legitimate law practice makes it less likely that he had

8     corrupt intent to bribe Villanueva is precisely the type of

9     propensity inference that Rule 404(b)(1) is intended to

10    prohibit.").

11         The other prior protest evidence is also not relevant

12    to providing the complete story or narrative, as argued by

13    defendant.  Evidence of prior protests where defendants did not

14    use force, threats of force, or physical obstruction would not

15    be relevant to whether defendants used force, threats of force,

16    or physical obstruction during the charged instances.  They

17    would not complete any narrative or story as to whether

18    defendants used force, threats of force, or physical

19    obstruction to intentionally injure, intimidate, or interfere

20    with patients at the Manhattan planned parenthood because they

21    were providing reproductive health services as charged here.

22    Earlier independent incidents would not complete the narrative

23    of what occurred on that day, and even what defendant intended

24    on those days.

25         The cases cited by defendants do not persuade the

1    Court otherwise.  In U.S. v. *Sheffield*, 992 F.2d 1164, 1170

2    (11th Cir. 1993), an out-of-circuit case, the district court

3    held that evidence of a practice at an air force base of making

4    authorized retirement gifts had no bearing on whether Mr.

5    Sheffield ordered fishing lures made for his own benefit in

6    violation of the law.  The Eleventh Circuit reversed because it

7    found that "evidence of the gift-making custom was relevant to

8    Mr. Sheffield's state of mind when he ordered the production of

9    fishing lure molds.  It pertains to Mr. Sheffield's claim that

10   the lure molds he ordered were for an authorized retirement

11   gift, and that Mr. Singletary went beyond the scope of the

12   project on his own initiative." *Id.* at 1170.  This evidence

13   was not prior independent good acts admitted to show that the

14   defendant did not have the intent to violate the law in the

15   case at hand.  Instead, the evidence was part of the background

16   facts by which to evaluate why the lure molds were ordered,

17   directly relevant to whether the defendant ordered them in

18   order to make fishing lures for his own personal benefit or for

19   retirement gifts.  Evidence of prior protests where defendants

20   did not use force, threats of force, or physical obstruction

21   would not be relevant to whether defendants used force, threats

22   of force, or physical obstruction during the charged instances.

23        Defendants argue that the evidence that they and their

24   organizations followed a near identical pattern of preplanned

25   behavior and protesting that was intended to remain within the

bounds of a lawful protest should be permitted under Rule 406

to show that defendant acted in accordance with this lawful

routine practice.

First, insofar as defendant is arguing that earlier

lawful protests show their modus operandi, the Court rejects

that.  In order to admit the evidence to establish a pattern or

a modus operandi, the extrinsic acts must share "unusual

characteristics" with the acts charged or represent a "unique

scheme." *Berkovich v. Hicks*, 922 F.2d 1018, 1022 (2d Cir.

1991).  The "unusual characteristics" standard allows evidence

of wrongful acts to be admitted in order to prove other like

acts by the defendant so nearly identical in method as to

earmark them as the handiwork of the defendant.  Here, much

more is demanded than the mere repeated commission of acts of

the same class.  The device must be so unusual and distinctive

so as to be like a signature." *Republic of Turkey v.

Christie's*, 527 F.Supp. 3d 518, 524 (S.D.N.Y. 2021).

Here the same logic applies to defendants' use of

prior lawful protests.  There is nothing unusual or unique

about the prior protests that would show that lawful protests

were a signature of the defendants.  Again, this is another

reformulation of impermissible propensity evidence whereby

defendants are arguing that because they protested without

force, threats, or physical obstruction in the past, they acted

in conformity with their character or did not do so in the

1  dates charged.

2         Again, the cases cited by defendants do not persuade

3  the court otherwise.  In *U.S. v. Stever*, 603 F.3d 747 (9th Cir.

4  2010), the Ninth Circuit, and not the Second Circuit, held that

5  exclusion of the modus operandi evidence offered by the

6  defendant of the Mexican drug organization was improper under

7  404(b) because it was relevant to the case.  The court pointed

8  out that it had affirmed admission of testimony that drug

9  traffickers typically do not entrust large quantities of drugs

10  to unknowing transporters.  Or evidence that Mexican

11  organizations planted in remote areas of land that they do not

12  own, operate their grows in certain visibly ascertainable ways,

13  and typically do not involve Caucasians in their operations is

14  similarly admissible consistently with 404.  That type of modus

15  operandi evidence offered by defendants certainly differs from

16  that here.

17         Defendants have likewise not shown that this evidence

18  is admissible as a habit or routine practice.  Framing

19  something as being a habit or practice of protesting without

20  force, threats of force, or physical obstruction is another way

21  of dressing up propensity character evidence.  Defendants'

22  argument boils down to defendants did not use or threaten force

23  in the past, and therefore they acted in conformity with those

24  prior good acts.  This is not permissible habit evidence.

25  Habit evidence is different.  For example, in *Rajaravivarma v.*

*v. Board of Trustees for Connecticut State University*, 272

F.R.D. 315, 319 (D. Conn. 2011), the Court noted that "a

common-sense example of admissible habit evidence would be

testimony that a person always holds the receiver with the

right hand when speaking on the telephone."

Similarly, in *U.S. v. Al Kassar*, 660 F.3d 108, 123 (2d

Cir. 2011), the Court excluded evidence of defendants' prior

good acts to establish proof of habit under Rule 406,

explaining a habit is "semiautomatic.  It involves a person's

regular practice of meeting a particular kind of situation with

a specific type of conduct, such as the habit of going down a

particular stairway two stairs at a time."  I note that

*Loussier v. Universal Music Group, Inc.*, 2005 WL 5644420 at *2

(S.D.N.Y. Aug. 30, 2005) states that "Difficulty arises in

drawing a line between inadmissible character evidence and

admissible habit evidence.  For this reason, courts have been

cautious in allowing evidence that attempts to prove a pattern

of conduct as habit because of the risks that such evidence

will be used to establish a party's propensity to act in

conformity with his general character, which is specifically

prohibited by Federal Rule of Evidence 404."  Defendants'

reliance on habit is just another way to try to argue

propensity.

Even if there were a proper purpose to admit the

evidence as relevant, under a 403 analysis, admission of such

1    prior protests would confuse the issues, delay the trial,

2    especially given if defense seeks to introduce several

3    instances of continuously protesting over the years, and

4    potentially mislead the jury into evaluating protests that are

5    not at issue in this case.

6          Finally, the government has brought a conspiracy claim

7    here alleging that the defendants engaged in a conspiracy from

8    2019 to 2022 to violate the FACE Act.  Defendants argue that

9    this evidence is relevant to undermining the government's

10   theory here of ceaseless bad conduct, citing to cases like *U.S.*

11   *v. Damti*, 109 Fed. Appx, 454, 456 (2d Cir. 2004).  The

12   defendants' opposition brief at 14.

13         However, as the Second Circuit advised in *Damti*,

14   "evidence of past good acts by a defendant is generally not

15   probative unless a defendant is alleged to have always or

16   continuously committed bad acts." *Damti*, 456-57.  That is not

17   what the government is alleging here or what will be presented,

18   to the Court's understanding.  Rather, defendants are charged

19   with a conspiracy to violate FACE and specific overt acts in

20   furtherance of that conspiracy during a specified period of

21   time, not that every action by the defendants or their

22   organizations in protesting were continuous bad acts.  An

23   illustrative example is *U.S. v. Rivera*, 2015 WL 17259991 at *2.

24   (E.D.N.Y. Apr. 15, 2015).  And the parenthetical reads:

25   (Finding that defendants were not charged with ceaseless

1    criminal conduct where they were charged with RICO conspiracy

2    and a specific pattern of criminal conduct).

3           However, if the government opens the door to prior

4    incidents by eliciting that it addresses the witness' state of

5    mind in interacting with the defendants, defendants can then

6    cross on prior instances that the witness knew of and bring out

7    that they did not involve force, etc.  The government has

8    represented now that it will not do so, but in the event that

9    they do, the defendants will be able to elicit that more

10   expansive cross.  That is because it would be relevant to the

11   witness' state of mind.

12          In addition, if the witness testifies with respect to

13   knowing the defendants because of a prior interaction with the

14   defendant, the defendants will be able to cross-examine that

15   witness with regard to those prior interactions.  This would be

16   relevant to showing whether the witness has any animosity or

17   bias toward the defendant and that would be relevant to this

18   case.  It would not be unduly prejudicial and it would not be a

19   waste of time or confuse the jury because it would be directly

20   relevant to the testimony that would be presented.

21          I'll deal with any cumulative or delay-of-trial

22   arguments if too much testimony is being elicited, but I will

23   not foreclose the defendants from asking about prior

24   interactions that those witnesses had with the defendants, even

25   if those actions were considered either lawful or peaceful

1    protests or otherwise, quote, good acts.

2            In conclusion, the defendant may not expansively

3    independently introduce evidence regarding prior protests by

4    them or their organizations that did not involve force, threats

5    of force, or physical obstruction or open in their opening

6    arguments about how the defendants always protest peacefully

7    and that this is an aberration.  But if the government opens

8    the door with respect to its witnesses, the defendants will be

9    able to question those witnesses about their interactions or

10   their knowledge of the defendants' prior acts.

11           Anything else with respect to that motion, Ms.

12   Steiner?

13           MS. STEINER:  No, your Honor.

14           THE COURT:  Anything else, Mr. Mysliwiec?

15           MR. MYSLIWIEC:  No, your Honor.

16           THE COURT:  And Mr. Scholar.

17           MR. SCHOLAR:  No, your Honor.  Thank you.

18           THE COURT:  We will deal with it at trial if there

19   becomes some lines we need to draw, but generally that's my

20   ruling.  If we need to address anything with more specificity,

21   we will do that during the trial.

22           The next part of the government's motion is that the

23   government is seeking to preclude the defendants from

24   introducing evidence regarding the government's conduct and

25   motivation for prosecution, including selective prosecution.

1    The defendants have responded that they do not intend to

2    introduce that evidence nor do they object to that portion of

3    the motion.

4                 Is that correct, Mr. Mysliwiec?

5                 MR. MYSLIWIEC:  That's correct, your Honor.

6                 THE COURT:  Mr. Scholar.

7                 MR. SCHOLAR:  Yes, your Honor.

8                 THE COURT:  Therefore, I would grant that unopposed

9    motion.  Insofar as any of that evidence would be introduced,

10   it should not be introduced.

11               Finally, the government seeks to preclude the

12   defendants from arguing that they were engaged in a lawful

13   expression of their personal beliefs and that the government

14   has charged them with engaging in conduct that is protected by

15   the free-speech or free-exercise clause.  The defendants object

16   and state that the defendants should not be prohibited from

17   arguing that they intended to engage in First Amendment

18   activity and the exercise of their religion instead of

19   intending to commit acts that violate the charged statutes.

20               I'll hear from the government about their response,

21   now that you have seen the defendants' response.

22               MS. JOHNSON:  Thank you, your Honor.

23               Here the government has to prove every element of the

24   charged offense beyond a reasonable doubt.  The government

25   submits that it's entirely proper here for the defendants to

1    argue that they didn't have the requisite intent to commit

2    these crimes or that they didn't use force, threats of force,

3    or physical obstruction.

4            But what the government submits is improper is

5    couching those arguments in the language of the First

6    Amendment.  The jury will be instructed on the definitions of

7    use of force, threats of force, etc.  In particular, threat is

8    a term that can implicate some First Amendment protected

9    activity.  As the Court knows, there is a tremendous amount of

10   case law on what constitutes a threat, what is a true threat

11   and what is First Amendment protected activity.

12           What the government is seeking to preclude the

13   defendants from doing here is arguing to the jury about what

14   the First Amendment does or does not do or whether the

15   defendants were exercising their freedom of speech or their

16   freedom of religion.  That, in the government's view, is a

17   legal question for the Court and that arguing that to the jury

18   would invite the jury to potentially acquit even if the

19   government had otherwise proved its case.

20           The government submits that it is entirely -- the

21   defense can accomplish all of these same objectives just by

22   arguing that the government hadn't met its burden with respect

23   to the particular elements, all of which do take into account,

24   as I mentioned, the threats.  The definition of threats takes

25   into account what is or what is not protected activity.  But

1  asking the jury to decide whether or not what the defendants

2  were doing is protected by the First Amendment is beyond the

3  scope of the jury's purview here.

4         THE COURT:  Thank you.

5         Would defense like to be heard?

6         MR. MYSLIWIEC:  Just briefly, your Honor.

7         I hope we laid out clearly what we intend to

8  accomplish and what we are not intending to argue with

9  reference to the First Amendment.  For example, we are not

10  arguing the First Amendment trumps the FACE Act, and we are not

11  going to ask the jury to try to make that conclusion.

12         I think what we do feel like we should be entitled to

13  point out, and we have asked for a jury instruction about this

14  as well, and it has been my experience in other kinds of cases,

15  where there is a lot of like angry rhetoric -- I mean, some of

16  the rhetoric in this case -- again, I am not sure how much of

17  the videos the Court has looked at, but some of it is almost

18  like verbatim quotes from the Bible, and they sound like really

19  violent statements and can sound that way.

20         I think the First Amendment provides context for

21  understanding that people can say those kinds of things, and by

22  saying them alone it's not a violation of the criminal statute

23  here.  We are not going to argue that the First Amendment

24  allows, for example, Ms. Chavannes to intentionally intimidate,

25  interfere, or attempt to injure someone who is seeking

1  reproductive health services.  We are going to be very clear

2  that that's not our argument.

3        Our argument will be that Ms. Chavannes went there

4  that day and acted that day with an intent to angrily, loudly,

5  uncomfortably for some people, advocate a particular viewpoint

6  that's based both on her religious views and her political

7  views.

8        THE COURT:  Why couldn't you do that which you have

9  just described without invoking the First Amendment

10  protections?

11        MR. MYSLIWIEC:  That will obviously be our plan B if

12  the Court rules that there can be no reference to the First

13  Amendment.

14        My concern is, just like there are other

15  constitutional rights, and this argument we laid out, I think,

16  in our briefing pretty clearly, there is a burden of proof.

17  There is a right to remain silent.  There is a right not to

18  testify.  We instruct jurors about those things.  We don't

19  assume that they know that those are principles of law.

20        And the aspect that somebody can stand up, say violent

21  things, angrily, loudly, and in ways that make people

22  uncomfortable is what the First Amendment is, and that's why we

23  ask for an instruction on it.  But without some instruction

24  that can be lawful conduct, I think there could be a natural

25  tendency for a juror to assume it must be with the intent to

1    intimidate, it must be the intent to harass.

2           So that's why I think that this instruction and

3    reference to the First Amendment is important, so that the jury

4    is not confused or misled just because somebody says some

5    violent-sounding things, like, we are going to bring down the

6    house of our enemies.  That's essentially a paraphrase from a

7    biblical passage.  The enemy is satin.  And there are many

8    religious people who say, we are going to bring down the house

9    of our enemies.  It doesn't mean that when they are standing

10   outside someplace.  They mean in practical terms that they are

11   going to burn the place to the ground or that they are going to

12   take a tank and fire canon shots at it or blow it up with a

13   grenade.  That's not what it means.  It's angry,

14   violent-sounding language that refers to essentially a biblical

15   passage.

16          And without some clarifying instruction from the Court

17   or referring to First Amendment, my concern is that the jurors

18   won't essentially credit the kind of argument that we are

19   making here about intent.

20          THE COURT:  Thank you.

21          Mr. Scholar, anything to add?

22          MR. SCHOLAR:  I agree with what my colleague said.  I

23   think that there is a real danger, especially in a case like

24   this, where there is discussions about protesting, that the

25   jurors that come in, even though they are being told to leave

1  their opinions aside, they understand protesting, they

2  understand what's happening outside their doors.  However, we

3  can't assume that they understand what the First Amendment

4  means or says.

5      So an instruction I think would be helpful to the jury

6  so that we could avoid the confusion from different jurors, if

7  it happens, expressing contrary views or views that actually

8  confuse the ultimate issue here, as opposed to clarifying it.

9      THE COURT:  Thank you.

10      I'll rule on this motion.

11      The Court will not permit the defendants to argue that

12  their actions were aligned with the First Amendment.  The Court

13  has already held that this prosecution does not violate the

14  First Amendment.  Although the statute itself states that it

15  does not criminalize constitutionally protected conduct, any

16  argument that defendants' conduct was constitutionally

17  protected is a legal argument for the Court, and I considered

18  those arguments on the motion to dismiss and rejected them.

19  Invoking the First Amendment during the trial would be asking

20  the jury to speculate as to what the First Amendment protects

21  or does not protect, and this Court has already held, based on

22  binding precedent, that the charged conduct does not violate

23  the First Amendment.  This is so even if there is an

24  instruction regarding what the First Amendment means.

25      With respect to the argument from defendants that this

1    evidence is relevant to intent, it is also not relevant if the

2    defendants intended to exercise their First Amendment rights if

3    they also, as charged, and the jury will be instructed,

4    intended to injure, intimidate, or interfere with patients or

5    employees of a reproductive health center.  Whether the

6    defendants believe that their conduct was protected by the

7    First Amendment is inconsequential if they used force, threats

8    of force, physical obstruction, and intended to injure,

9    intimidate, or interfere with patients or employees of a

10   reproductive health center because of their roles as staff and

11   patients.  Ignorance of the law is no defense, and the Court

12   has already made its legal findings with respect to the First

13   Amendment's application to this case based on Second Circuit

14   precedent.

15          Therefore, the evidence is not relevant.  It's also

16   impermissible under Rule 403 because it will confuse the

17   issues, invite jury nullification, and mislead the jury about

18   whether or not they have to make constitutional determinations,

19   which they do not.  This was done as a matter of law in the

20   motion to dismiss.

21          Therefore, the jury will be instructed and the parties

22   should focus at the trial as to whether defendants had the

23   requisite intent to injure, intimidate, or interfere, and

24   whether they used force, threats of force, or physical

25   obstruction.  If they did not have this intent or motive or did

1    not use these means and instead peaceably protested, that is

2    what they will argue and prove.

3           However, insofar as the government seeks to preclude

4    the defendants "from arguing that they were engaged in a lawful

5    expression of their personal beliefs," they will not be so

6    precluded.  Defendants may argue that the government did not

7    meet the burden, that they were engaged in behavior that's not

8    violative of the FACE Act because they did not use force,

9    threats of force, or physical obstruction, or act with the

10   intent to injure, intimidate, or interfere because people were

11   seeking reproductive health services.  They can argue that the

12   quotes that they said were from the Bible and need to be read

13   in context.  They can argue again that they did not violate the

14   elements of the FACE Act, and the jury will be instructed as to

15   what a threat is and the other limits in which to evaluate the

16   conduct that's alleged here.  The defendants will just not be

17   able to argue that their actions were protected or they thought

18   they were protected by the First Amendment.

19          Anything further with respect to that motion from the

20   government?

21          MS. JOHNSON:  No, your Honor.

22          THE COURT:  Anything further from the defense?

23          MR. MYSLIWIEC:  No, your Honor.

24          MR. SCHOLAR:  No, your Honor.

25          THE COURT:  Thank you.

 1              I think that takes me through all of the motions *in*

 2  *limine*.

 3              Ms. Steiner, is that correct?

 4              MS. STEINER:  That is correct, your Honor.

 5              THE COURT:  From defense, Mr. Scholar, there is no

 6  further motions *in limine* from the defendants, right?

 7              MR. SCHOLAR:  No, your Honor.

 8              THE COURT:  Thank you.

 9              Now, that takes me through most of what I wanted to

10  cover during this final pretrial conference.

11              I also wanted to move a bit, since I have you all

12  here, with some of the questions and issues I have with regard

13  to the jury charge.  I am not preempting our charging

14  conference, or anything like that.  I just thought, since I

15  have you here, I would ask you some questions because I've been

16  looking at it.

17              Before I get there, is there anything further that

18  either of the parties would like to discuss at this final

19  pretrial conference from the government?

20              MS. JOHNSON:  Your Honor, just two logistics issues.

21              THE COURT:  Yes.

22              MS. JOHNSON:  I note that Court Exhibit 1, which is

23  the draft question for the jury, has a placeholder for the list

24  of people and places that may come up at the trial.  The

25  government would propose to consult with the defendants and

1  provide the Court with a joint list in a week's time, so

2  Friday, the 9th, if that's enough time for the Court.

3          THE COURT:  Yes, that's fine, and thank you for

4  reminding me of that.  I had that on my list as well.  The 9th

5  if you could produce that joint list, that would be helpful.

6          What else?

7          MS. JOHNSON:  Just to flag for the Court, as I

8  mentioned earlier, and as I think the defense previewed, we may

9  be getting some defense exhibits soon.  To the extent we need

10  to raise any issues with the Court, we will write to your

11  Honor.

12          THE COURT:  Yes.  Thank you.

13          MS. JOHNSON:  That's all.

14          THE COURT:  Thank you.

15          Anything further we should discuss before I get into

16  some charging issues, Mr. Scholar?

17          MR. SCHOLAR:  No.  Thank you.

18          THE COURT:  Thank you.

19          Anything further, Mr. Mysliwiec?

20          MR. MYSLIWIEC:  No, your Honor.

21          THE COURT:  Thank you.

22          Let's spend a little bit of time, since I have you

23  here, on the jury charge.  Both because it will help me get a

24  little bit of research done before the trial, and also it may

25  help you understand where I'm going so that when we start the

1  trial with respect to your openings, etc., you will know where

2  things are going.

3        First of all, with respect to the general requests

4  that the parties asked for, I think I have all of them covered,

5  but there are two that I wanted to know about that I don't have

6  in my standards.

7        One is:  The jury's recollection governs.  I certainly

8  can add a sentence that says "if any reference by me or the

9  attorneys to the evidence is different from your own memory of

10 the evidence, it is your memory that should control during

11 deliberations."

12       But is there otherwise a standard instruction that the

13 parties would propose, Ms. Johnson?

14       MS. JOHNSON:  Not to my knowledge.  That instruction

15 seems sufficient.

16       THE COURT:  Mr. Scholar.

17       MR. SCHOLAR:  Same, Judge.  Thank you.

18       THE COURT:  Mr. Mysliwiec.

19       MR. MYSLIWIEC:  I agree, your Honor.

20       THE COURT:  The one I don't have, if the parties could

21 send me one, is the duty to weigh evidence without prejudice.

22 I have a sympathy and bias charge.  I have some other things.

23 But if there is a particular charge with respect to -- I think

24 it's letter K on your proposed list, the duty to weigh evidence

25 without prejudice.  If you could please submit that to me, that

1   would be helpful.  If you could submit it by that February 9

2   date when you're submitting your list, that will be our

3   follow-up date for information.

4           The next item that I have here is request number 5.

5   That is the First Amendment instruction requested by

6   defendants.  I am just going to let you know now that I'm

7   not -- absent something happening at trial, I am not going to

8   charge on the First Amendment for the same reasons that I ruled

9   with respect to the motion *in limine*.  The cases that were

10  cited by defendant in support of the instruction are not

11  persuasive to me.  Let me just go over a few of them with you.

12  The *McCullen v. Coakley* case, 537 U.S. 464 (2014).  In that

13  case, the Supreme Court held that the Massachusetts

14  Reproductive Healthcare Facilities Act violated the First

15  Amendment.

16          This Court has already held in this case that the FACE

17  does not violate the First Amendment based on Second Circuit

18  precedent in *U.S. v. Weslin*, 156 F.3d 292, 296 (2d Cir. 1998).

19  Similarly, in *Snyder v. Phelps*, 562 U.S. 443, 452 (2011), the

20  Supreme Court held that a picketer was not liable for tort

21  liability from picketing because his actions were protected by

22  the First Amendment.  Again, I denied the motion on First

23  Amendment grounds.  And, similarly, *U.S. v. Grace*, 461 U.S. 171

24  (1983) holds that displaying a flag in a particular way or a

25  prohibition on displaying a flag in a particular way was

1  unconstitutional.  Again, the Court has already made its

2  constitutional rulings.

3       Defendants cite *U.S. v. Hammoud*, 381 F.3d 316 (4th

4  Cir. 2004) for the proposition that the statute prohibiting

5  material support of a terrorist organization does not prohibit

6  mere association or advocacy for the terrorist organization,

7  but rather prohibits the conduct of providing support to a

8  terrorist organization.

9       Likewise here, the indicted conduct is the conduct

10  associated with the activity or conduct of the defendants

11  vis-a-vis clinics and not just their association with groups

12  like pro-life groups.

13       I am not inclined to give that request number 5 or the

14  additional sentence in request 13.  I just wanted to make sure

15  you knew that going into the trial.

16       The next one that I would like to discuss is request

17  number 8.  And in request number 8 defendant has suggested a

18  sentence be included that says:  "Merely making the approach to

19  a reproductive health facility unpleasant or even emotionally

20  difficult, however, does not constitute physical force."

21       I looked at the authority that the defendants cited

22  for this request, and it is more equivocal than was represented

23  in the sentence that the defendant is requesting.  In the

24  authorities cited, the Second Circuit stated in *State of New*

25  *York v. Operation Rescue*, 273 F.3d 184 at 195-96 (2d Cir.

1    2001), the Second Circuit stated:  "The fact that such protests

2    make approaching health facilities unpleasant and even

3    emotionally difficult does not automatically mean that such

4    protest activities may be curtailed."  And it is a bit unclear

5    what making the approach "unpleasant" means out of the context

6    of the Second Circuit's discussion.

7         When I looked at that case further, the Second Circuit

8    did advise that prohibiting physical obstruction for purposes

9    of face should not move into "an uncertain and potentially

10   slippery concept" of prohibiting what it called "constructive

11   obstruction," pointing to protesting "in an angry voice and one

12   protester's habit of shouting at arriving patients in a loud,

13   deep voice."  That's at page 195 of the *Operation Rescue* case.

14        What I did find persuasive about the suggestion by the

15   defendants is that we perhaps should reflect that some sort of

16   physical act is required for the physical obstruction portion

17   of that charge and that nonphysical actions, such as yelling or

18   something that may make it more unpleasant or even emotionally

19   difficult, wouldn't constitute physical obstruction.  It may

20   fall under some other portion, but that seems to me to be the

21   thrust of the *Operation Rescue* case that was cited by the

22   defendants here.

23        I'd like to hear a little bit from the government

24   about whether adding a sentence to the physical obstruction

25   portion -- again, the reason I'm talking about this now is that

1     if defendants want to be arguing about this, I want them to

2     know whether it's going to be an issue with respect to the

3     charge.  Again, I'm not making a decision right now.  I just

4     want to talk about it a little bit.

5          Whether the government would have an issue adding

6     something like nonphysical actions such as yelling that make

7     the approach to a reproductive health facility unpleasant or

8     even emotionally difficult do not constitute physical

9     obstruction.

10          I want to hear from you, and then I'll hear from the

11     defendants, about whether that reformulation of the sentence

12     that they have suggested works for them as well.

13          What is your thought, either Ms. Steiner or

14     Ms. Johnson?

15          MS. JOHNSON:  Your Honor, appreciate the Court

16     flagging this issue in advance.  If the Court is amenable, the

17     government would prefer to respond to the Court by letter so we

18     have an opportunity to review the case law before we talk to

19     the Court about this.

20          Is that something the Court would consider?

21          THE COURT:  Yes.  Let me hear from defense first, and

22     we will decide on a process for this.

23          Who from defendant would like to be heard?  Am I

24     getting the concept of what you are trying to get across in

25     that sentence?

1          MR. MYSLIWIEC:  Yes, your Honor, you are.  We included

2    that authority in the request.  We also had a black quote of

3    that in our motion *in limine*.  I think it kind of falls into

4    the plan B option.

5          So, in a sense, the Court is not going to instruct on

6    First Amendment or what the law is, but should instruct that

7    something to the extent that merely making the approach

8    unpleasant or even emotionally difficult doesn't constitute

9    physical obstruction, and I think also it relates to even

10   interfering or intimidating.  That conduct in and of itself

11   could exist without it essentially meaning intimidation or

12   interference.

13         So I think it's important that the Court include some

14   kind of description.  We took our best shot at it.  Certainly

15   not only does the Court have the authority to use different

16   language, but I would invite the Court to fashion alternative

17   language that accomplishes that goal for the elements that are

18   at issue.

19         THE COURT:  Thank you.

20         Mr. Scholar, anything further?

21         MR. SCHOLAR:  No, your Honor.  I would also welcome

22   the opportunity to look at it further.  Standing here today, I

23   don't think I have a problem with what the Court has proposed.

24         THE COURT:  Why don't I do this.  I'd like the

25   parties -- you have heard my inclination, my reading of the

1    case that has been cited by defendants, the fact that I do find

2    it compelling that we shouldn't have sort of constructive

3    obstruction, meaning physical obstruction is physical

4    obstruction and what the Second Circuit says to me in that case

5    is compelling.

6            So what I would ask is to ask the parties to discuss

7    whether there is an agreeable additional sentence that can be

8    added along the lines of what's been suggested by the

9    defendants.  You can look at the cases, Ms. Johnson, and see

10   where you land.  I'll fashion something, absent an agreement,

11   or maybe I won't, depending on what our discussion is at the

12   charging conference.  If the parties can come to some agreement

13   as to an additional sentence to be added there, that would be

14   helpful.

15           Understood, Ms. Johnson?

16           MS. JOHNSON:  Yes, your Honor.

17           THE COURT:  If you can include that in your letter --

18   the letter that's coming on February 9 would be a joint letter.

19   I'm not saying that everyone has to agree with everything in

20   the letter.  If the letter, for example, says, we endeavored to

21   come up with a sentence and this is what the government's

22   sentence is and this is what the defendants' sentence is,

23   that's perfectly fine too.  I just don't want to get multiple

24   submissions on that day.

25           Since we are doing things that are a bit more

1    substantive, if we can make this letter February 7, that's

2    better because then I can look at it before the trial starts.

3        The next issue that I would like the parties to think

4    about again a bit before the charging conference is request

5    number 9.  This is the request that talks about essentially

6    intent.  There is a couple of things I want to raise with the

7    parties here.

8        The defendant seeks to add a sentence saying:  If you

9    find that the defendant acted inadvertently or by mistake or

10   with some intent other than to purposefully injure, intimidate,

11   or interfere with a patient or Manhattan Planned Parenthood

12   employee, then you may not find this element of the offense

13   proved.

14       I looked at the authority on which the defendant

15   relies, and let me just go through it a little bit and give you

16   some thoughts.

17       First, defendant cites to Black's Law Dictionary,

18   which has several definitions of intent which did not give me a

19   lot of guidance or help there.

20       They also cited to a civil Pattern Jury Instruction at

21   Section 121-01, Fifth Edition, 2000, of the Federal Jury

22   Practice and Instructions, which says "intent ordinarily may

23   not be proved directly because there is no way of understanding

24   or scrutinizing the operations of the human mind, but you may

25   infer a person's intent from surrounding circumstances, you may

1   consider any statement made or act done or omitted by a party

2   whose intent is at issue, and all other facts and circumstances

3   indicating that party's state of mind.  You may consider it

4   reasonable to draw the inference and find a person intends the

5   natural and probable consequences of acts knowingly done and

6   knowingly omitted.  It is for you to decide what facts have

7   been established by the evidence."

8          That instruction is fine enough and if the parties

9   would like me to include an instruction on intent, I would

10  probably rather include the one from the Criminal Pattern

11  Instructions, which would be, let's say, from Federal Jury

12  instructions, O'Malley's instructions at Section 17.07, and I'm

13  happy to do that, but that's a little bit different than what's

14  been proposed in the instruction.

15         My first thing is, can you please let me know when you

16  discuss whether I should include 17.07 in the O'Malley

17  instructions, which is the intent instruction.  Again, I'm

18  happy to do that, which basically says, you may have to look to

19  inferences in order to figure out intent.  If you can both

20  discuss that and let me know on that, that would be helpful.

21         But then the other question is, the final thing that

22  defendant has cited to is *U.S. v. Gregg*, 32 F.Supp. 2d 151,

23  156. (D.N.J. 1998) to say that intending to perform the acts

24  and is aware of the natural and probable consequence of it.

25  That's what intent means.  Again, that seems to comport with

1  that pattern instruction I just talked about, and I'm happy to

2  do that.  It's just not in the instruction that the -- in the

3  sentence that defendant has proposed.  So you'll talk to me

4  about whether I should do that pattern instruction.

5  What seems to be the issue that the defendant is

6  trying to get to here is the concept of acting inadvertently or

7  by mistake.  That sort of concept should be included.

8  What I'd like to hear from the parties on, especially

9  the government, is about whether we should be including a

10  charge, such as the model Federal Jury Instruction for Criminal

11  Matters 34-4 on intentionality that states something like the

12  following -- not something.  It states the following:  "The

13  government must prove beyond a reasonable doubt that the

14  defendant acted intentionally when he, let's say here, injured,

15  intimidated or interfered with the Manhattan Planned Parenthood

16  employee or patient."

17  Before you can find that the defendant acted

18  intentionally, you must be satisfied beyond a reasonable doubt

19  that the defendant acted deliberately and purposefully, that

20  is, the defendants' acts must have been the product of

21  defendants' conscious objective rather than the product of a

22  mistake or accident.  That Second Circuit has expressly

23  approved this charge in *U.S. v. Bell*, 584 F.3d 478, 484 (2d

24  Cir. 2009).

25  Let me hear from the defense first to see, is that

1    what you're really trying to get at, the accident and mistake

2    concept in your suggested sentence?  If so, would a model

3    charge like what I have just read satisfy your request?  Again,

4    you don't have to conclusively decide.  I am just trying to vet

5    some of these issues.

6           MR. SCHOLAR:  May I have a moment, Judge?

7           THE COURT:  Absolutely.  Take your time.

8           MR. MYSLIWIEC:  Your Honor, I think our answer is yes.

9    We will take a look at that instruction specifically.  If there

10   is some other language we propose to include as part of it, we

11   will.  But I think we agree with the Court's inclination on

12   that.

13          THE COURT:  Thank you.

14          I'll hear from the government.  What is your thought?

15          MS. JOHNSON:  Your Honor, again, if this is something

16   we could look into and include in that joint letter on the 7th,

17   we would appreciate that.

18          THE COURT:  That's fine.

19          Look then at, again, Modern Federal Jury instruction

20   Criminal 3A-4 under intentionally.  It's that one as well as

21   the O'Malley Criminal Federal Jury Instruction Section 17.07.

22   Those are the two that I think are trying to capture what

23   defense is trying to capture.  Let me know your thoughts on

24   that.

25          The next one is request number 10 I wanted to talk

1    about.  That has quite a bit of additions from the defendant.

2    I wanted to discuss a bit this concept of the because of.  I

3    think that's what we are talking about in this request, what it

4    means to act because employees of Planned Parenthood were

5    providing reproductive health services, etc.

6         I recognize that there are no pattern FACE act

7    charges, so we are all kind of doing our very best here, and I

8    do recognize that the last paragraph of the government's

9    proposed charge comes from the *U.S. v. Darnell* case, 22 CR 96

10   in the District of Columbia 2023, in a FACE Act case.  I know

11   we are doing our best to pull from those things.

12        When I looked at the case cited by defendant in trying

13   to interpret how to work through this request number 10, I

14   didn't find it particularly helpful.  The *Guzman-Vazquez v.*

15   *Barr* case, 959 F.3d 253 (6th Cir 2020), doesn't seem to be the

16   appropriate authority to consider here because that's a

17   completely different context where you have express statutory

18   language that was considered in the immigration context.

19        So in an immigration case the Court was reviewing

20   whether the individual was persecuted "because of his

21   membership with the particular social group that the

22   immigration judge found cognizable."  And it looked at the

23   particular statute to see whether that membership in the group

24   was a reason versus a central reason for the persecution.  And

25   the Sixth Circuit ultimately agreed with the Ninth Circuit that

1   "Congress' express incorporation of two of the three asylum

2   burden-of-proof provisions into the withholding of removal

3   statute, but not the provision including the

4   one-central-question language, indicates that Congress did not

5   intend for the one-central-reason standard to apply to

6   withholding of removal claims.  I'm sorry.  Both of it.  If the

7   court reporter can make sure it says one central reason in both

8   parts of that sentence.  *Id.* at 272.

9        And, therefore, the Court made its analysis that they

10  held that the applicants for withholding of removal under 8

11  U.S.C. Section 1231(b)(3) must demonstrate that a protected

12  group was at least one reason for their prosecution, as opposed

13  to one central reason, and they remanded to the BIA to decide

14  the case under the correct standard.

15       That type of statutory language is not at play here,

16  and I don't really have any reason why I should draw from an

17  analysis of an immigration statute in the Sixth Circuit in a

18  FACE case here.  But when I look at the other civil rights laws

19  and the pattern instructions associated with those civil rights

20  laws, those seem more appropriate to what I have here.

21       For example, damaging religious property, the pattern

22  instruction for that under 18 U.S.C. 247(a), and that statute

23  reads:  If you intentionally deface, damage, or destroy any

24  religious property because of the religious nature of that

25  property or attempt to do so see, you are guilty of a crime.

1          Instruction 17-21 talks about that motivation based on

2     the religious nature of the property, and it states that "the

3     second element that the government must establish beyond a

4     reasonable doubt is that the defendant damaged the property in

5     question because of the religious character of the property.

6     To prove this element, the government must prove that the

7     religious nature of the property was a substantial motivating

8     factor in the defendants' actions, such that the defendant

9     would not have acted in the way that he did but for the

10    religious nature of the property."

11         Similarly, in another statute, interference with

12    housing, that's 42 U.S.C. Section 3631(a), in that case the

13    statute prohibits someone who, by force or threat of force,

14    willfully injures, intimidates, or interferes with any person

15    because of his race, color, religion etc., and because he has

16    been selling, purchasing, renting housing, etc.

17         Again, it seems to track what we are talking about

18    here better, of course, than the immigration case that was

19    cited to me.  Similarly, in that case, it says the government

20    must prove that the race and occupancy of the dwelling were

21    substantial motivating factors in the defendants' actions such

22    that the defendant would not have acted in the way he did but

23    for the victim's race and their occupancy of the dwelling.

24    Again, the Hate Crimes Act instruction -- well, that

25    instruction was 17-29.  Under the Hate Crimes Act, 18 U.S.C.

1    249, instruction 17-41, again, is consistent with that.

2         My question really is, is whether we should draw from

3    that in crafting this instruction which would include a

4    sentence that says something like -- excuse me.  That tracks

5    the fact that the government must prove that the fact that the

6    patient was obtaining reproductive health services or that

7    someone was providing such services was a substantial

8    motivating factor in the defendants' actions such that the

9    defendant would not have acted in the way that he did or she

10   did but for that circumstance.

11        What I'd like to do is ask the parties to look at

12   those instructions to see whether you can come up with a

13   revised request number 10 that's agreeable to the parties.  If

14   you can't, I'll make my own decision, and I will come up with

15   the appropriate instruction.

16        But I'm letting you know that the case cited by

17   defendant doesn't seem to be on point.  The government hasn't

18   given me authority for the instruction as written by the

19   government, other than the D.C. instruction, which I looked

20   there and there is no authority there either.  So these other

21   statutes seem to me to provide nice authority for an

22   instruction, especially since the FACE Act was consciously

23   "modeled on several federal civil rights laws."  And I looked

24   there at S report number 103-117 and the 1994 U.S. CCAN 699 at

25   708.

1        If you could take some time to look at that request

2   number 10 and tell me whether there is a revised request, that

3   would be helpful.

4        I will also say that unless the government objects,

5   I'm not seeing a real issue with the paragraph suggested by the

6   defendants that says:  In determining whether the government

7   has proved that the defendant acted as she did, because a

8   patient was obtaining offer a clinic employee was providing

9   reproductive health services, you may consider statements made

10  or language used by the defendant, the circumstances

11  surrounding the alleged offense, and all other evidence that

12  may shed light on the defendants' motives.  That seems to me to

13  be a reasonable paragraph to add, unless the government has an

14  objection to it.

15       So think about that as you're coming back with your

16  draft instruction, if you have an agreed-upon one.  If you

17  don't, I will come up with my proposal, and we will discuss it

18  at the charging conference.  But if that's something that you

19  can discuss in advance, I think that that's helpful with some

20  of the background I've provided.

21       Finally, request 12 and 14.  Again, I'm not charging

22  First Amendment and, therefore, I think those probably are

23  going to fall because of that.  I'm certainly happy to hear any

24  other argument related to that, but I wanted to let you know

25  that.

1          Then requests 19 and 20, I have collapsed them because

2     I think they seem to be overlapping.

3          Those are my preliminary comments on the jury

4     instructions.  Where there are areas of disagreement I wanted

5     to give you some of my guidance so that you could talk about it

6     before the trial and perhaps reach an understanding if there is

7     not an understanding.  Again, you will let me know in that

8     joint letter, and I will make a determination, and we will

9     discuss this more fully at the charging conference.  I'll hear

10    argument.  We will talk about it.  But I thought it would be

11    helpful for you to hear at least my thoughts on what's been

12    presented to me so far?

13         Any questions about the jury charge that anyone else

14    would like to raise from the government?

15         MS. JOHNSON:  No, your Honor.  Thank you.

16         THE COURT:  Mr. Scholar.

17         MR. SCHOLAR:  No, your Honor.  Thank you.

18         THE COURT:  And Mr. Mysliwiec.

19         MR. MYSLIWIEC:  No, your Honor.  Thank you.

20         THE COURT:  The last thing is the verdict sheet that

21    we have here.  I see it has been agreed upon by the parties.

22         The couple of things that I do that I want to make

23    sure there is no issue for is, I typically try to be very

24    explicit about the questions that the jurors should not answer

25    so that I don't get inconsistent or verdict sheets that are not

1    appropriate.

2            So what I do with the verdict sheet, if the parties

3    agree, is after question 4, I would put in something like:  If

4    you answered guilty to question 4, proceed to question 5.

5    Question 5 says:  If you found the defendant Ms. Chavannes

6    guilty of Count Three, do you find that threats of force were

7    used?  But I would also include, if you answered not guilty to

8    question 4, do not answer question 5.  I want to just make sure

9    that I don't get people checking off things that they shouldn't

10   be answering if they are following the instructions

11   appropriately.

12           Then the second thing that I do with my verdict forms

13   is, I have all of the jurors sign the form and not just the

14   foreperson.

15           So those were the two changes that I would suggest

16   making to the verdict form.

17           Ms. Johnson, any objection at least right now on that?

18           MS. JOHNSON:  No objection, your Honor.

19           THE COURT:  We will talk about it at the charging

20   conference, but those would be the two things that I would

21   suggest changing in the form.

22           Mr. Scholar, any objections to those?

23           MR. SCHOLAR:  No, your Honor.

24           THE COURT:  Mr. Mysliwiec.

25           MR. MYSLIWIEC:  No, your Honor.

```
 1                THE COURT:  Great.
 2                That covers, I think, everything that we can discuss
 3   before trial so that we are absolutely ready for trial when we
 4   go.
 5                What I will expect to get from you on February 7 is a
 6   joint letter that covers all of the things from which I need
 7   follow-up.  If there are agreements on new portions of a
 8   request to charge, you can always even submit to me a new joint
 9   request to charge, if you'd like, that provides new language,
10   or you can provide inserts.  I don't care.  Whatever way you
11   want to do it is fine with me.  But if you could follow up with
12   that information, that would be helpful.
13                I believe that's all I have for this conference.
14                Does the government have anything else that they would
15   like to discuss today?
16                MS. JOHNSON:  Nothing from the government.  Thank you,
17   your Honor.
18                THE COURT:  Anything from you, Mr. Scholar?
19                MR. SCHOLAR:  Your Honor, if I could have one moment.
20                THE COURT:  Please.  Take your time.
21                MR. SCHOLAR:  Your Honor, would you authorize
22   transcripts for the defense?
23                THE COURT:  Yes.
24                MR. SCHOLAR:  We would be asking for dailies and
25   possibly Live Note.
```

1        THE COURT:  I believe so.  What's the government's

2   position on that, if you have one?

3        MS. JOHNSON:  I think generally we take no position.

4        THE COURT:  That's what I thought.

5        Mr. Mysliwiec.

6        MR. MYSLIWIEC:  Just to make it clear, also for

7   today's conference, because I think we will want to refer back

8   to the oral rulings that the Court had probably several times

9   as we prepare.  Just if that could be included in the

10  transcript authorization.

11       THE COURT:  Yes.  I don't think that that should be a

12  problem.  I will do that.

13       Anything else, Mr. Scholar?

14       MR. SCHOLAR:  No, your Honor.  Thank you.

15       THE COURT:  Anything else, Mr. Mysliwiec?

16       MR. MYSLIWIEC:  No, your Honor.  Thank you.

17       THE COURT:  Everyone is going to get their technology

18  tutorial done in advance of trial.

19       If there is any other information that needs to be

20  sent in to me, I will take it.  Otherwise, we will start at 9

21  a.m. on February 12.  We will probably have a bit of time to

22  deal with any issues because the jury, I'm sure, won't be ready

23  until at least 9:45.  Then we will go straight into jury

24  selection, instructions, openings and witness, if we have time

25  for a witness.  I am just not sure.

1          Does the government have any idea of how long their

2    openings will be?

3          MS. JOHNSON:  Your Honor, I anticipate it will be

4    under ten minutes.

5          THE COURT:  Mr. Scholar, if you are going to give an

6    opening, your have anticipated timing?

7          MR. SCHOLAR:  Probably longer than ten minutes.

8          THE COURT:  Mr. Mysliwiec.

9          MR. MYSLIWIEC:  Probably around the same time.

10          THE COURT:  That's fine.

11          Whatever it is, just know that you should have your

12    witnesses ready.  The government should have their witnesses

13    ready in the event that things move very rapidly on that

14    Monday.  They may not.  Jury selection may take more time than

15    we think, but I want to make sure that every minute is used.

16          MS. JOHNSON:  Understood, your Honor.

17          THE COURT:  Terrific.  Have a good weekend, everyone,

18    and court is adjourned.  Take care.

19          (Adjourned)

20

21

22

23

24

25