UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

– *v.* –

BEVELYN BEATTY WILLIAMS,

                    Defendant.

22 Cr. 684 (JLR)

**THE GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTIONS FOR A
JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL PURSUANT TO FEDERAL
RULES OF CRIMINAL PROCEDURE 29 AND 33**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Emily A. Johnson
Mitzi Steiner
Assistant United States Attorneys
- *Of Counsel* -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND ..................................................................................................................... 1

    I.    THE GOVERNMENT'S CASE ...................................................................................... 2

        A.    *Williams Obstructs Entrances* ........................................................................ 3

        B.    *Williams Threatens Staff* ............................................................................... 4

        C.    *Williams Uses Force and Causes Bodily Injury* ........................................... 4

    II.    THE DEFENSE CASE ................................................................................................ 6

    III.    JURY DELIBERATIONS AND VERDICT ..................................................................... 6

ARGUMENT .......................................................................................................................... 7

    I.    THE COURT SHOULD DENY THE DEFENDANT'S RULE 29 MOTION ......................... 7

        A.    *Applicable Law* ............................................................................................ 8

        B.    *Argument* ..................................................................................................... 9

    II.    THE COURT SHOULD DENY THE DEFENDANT'S RULE 33 MOTION ....................... 12

        A.    *Applicable Law* .......................................................................................... 12

        B.    *Argument* ................................................................................................... 15

CONCLUSION ..................................................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**

*Billups v. Costello*, No. 91 Civ. 6296 (S.D.N.Y. July 6, 1992) ...................................................... 15

*Dunn v. United States*, 284 U.S. 390 (1932) ..................................................................................... 14

*Hoag v. New Jersey*, 356 U.S. 464 (1958) ....................................................................................... 13

*Jackson v. Virginia*, 443 U.S. 307 (1979) .......................................................................................... 8

*Steckler v. United States*, 7 F.2d 59 (2d Cir. 1925) ........................................................................ 14

*Ulster County Court v. Allen*, 442 U.S. 140 (1979) ......................................................................... 14

*United States v. Acosta*, 17 F.3d 538 (2d Cir. 1994) ....................................................................... 14

*United States v. Aguiar*, 737 F.3d 251 (2d Cir. 2013) ....................................................................... 8

*United States v. Archer*, 977 F.3d 181 (2d Cir. 2020) ..................................................................... 12

*United States v. Cuti*, 720 F.3d 453 (2d Cir. 2013) ........................................................................... 9

*United States v. Dotterweich*, 320 U.S. 277 (1943) ........................................................................ 13

*United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001) ................................................................ 13

*United States v. Gambino*, 59 F.3d 353 (2d Cir. 1995) ................................................................... 12

*United States v. Guadagna*, 183 F.3d 122 (2d Cir. 1999) ................................................................. 9

*United States v. Hawkins*, 547 F.3d 66 (2d Cir. 2008) ...................................................................... 8

*United States v. Martoma*, 894 F.3d 64 (2d Cir. 2017) ..................................................................... 9

*United States v. Mercado*, 573 F.3d 138 (2d Cir. 2009) ................................................................. 14

*United States v. Nieves*, 354 F. App'x 547 (2d Cir. 2009) .............................................................. 14

*United States v. Persico*, 645 F.3d 85 (2d Cir. 2011) .................................................................... 8, 9

*United States v. Powell*, 469 U.S. 57 (1984) ............................................................................... 13, 14

*United States v. Sanchez*, 969 F.2d 1409 (2d Cir. 1992) ................................................................ 12

*United States v. Schlesinger*, 390 F. Supp. 2d 274 (E.D.N.Y. 2005) ............................................ 13

*United States v. Stone*, No. 05 Cr. 401, 2008 WL 420008, (E.D.N.Y. Feb. 11, 2008) ........... 14, 16

*United States v. Teman*, 465 F. Supp. 3d 277 (S.D.NY. Jun. 5, 2020) ......................................... 13

*United States v. Townsend*, No. S1 06 Cr. 34 (JFK), 2007 WL 2936308 (S.D.N.Y. Oct. 4, 2007) ................................................................................................................................................. 14, 16

*United States v. Valpais*, No. 05 Civ. 4373 DC, 2007 WL 1998942 (S.D.N.Y. July 10, 2007) .. 15

**Statutes**

18 U.S.C. § 371 ....................................................................................................................... 1

**Rules**

Federal Rule of Criminal Procedure 33(a) ........................................................................ 12

Federal Rules of Criminal Procedure 29 ............................................................................ 1

## PRELIMINARY STATEMENT

The Government respectfully submits this opposition to the defendant's motions for a judgment of acquittal and for a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33. On February 22, 2024, the defendant was convicted following a jury trial of violating the Freedom of Access to Clinic Entrances ("FACE") Act. The defendant now contends that the jury's verdict should be overturned pursuant to Rule 29 due to a lack of sufficient evidence to sustain the conviction. The defendant's argument is without merit. The evidence of the defendant's guilt presented at trial was overwhelming and was introduced in the form of victim and witness testimony, video recordings, and documentary evidence establishing both that the defendant repeatedly obstructed access to the Manhattan Planned Parenthood and that she caused bodily injury to a clinic staff member. The defendant's argument that the Court should vacate her conviction pursuant to Rule 33 because the jury rendered an improper compromise verdict is also unavailing. Indeed, the jury carefully deliberated before reaching a split verdict in this case and, in any event, a compromise or even inconsistent jury verdict is not a sufficient basis to disturb an otherwise unanimous verdict as a matter of law. For those reasons, and as set forth in more detail below, the defendant's motions should be denied.

## BACKGROUND

On December 13, 2022, a grand jury returned a three-count Indictment 22 Cr. 684 (JLR) (the "Indictment") charging defendant Bevelyn Beatty Williams in two counts and co-defendant Edmee Chavannes in two counts. Count One charged both Williams and Chavannes with conspiracy to violate the FACE Act, in violation of 18 U.S.C. § 371, in connection with the defendants' multi-year campaign to interfere with individuals seeking to obtain and provide lawful reproductive health services in New York, Georgia, Tennessee, and Florida. Count Two charged

Williams with violating the FACE Act on June 19, and June 20, 2020, during which Williams used force, threats of force, and physical obstruction to injure, intimidate, and interfere with patients and providers of reproductive health services at the Manhattan Planned Parenthood, which resulted in bodily injury. Count Three charged Chavannes with violating the FACE Act during the same incident on June 19, and June 20, 2020 by using threats of force and physical obstruction to intimidate and interfere with patients and providers of reproductive health services at the Manhattan Planned Parenthood. On February 12, 2024, trial began against both defendants.

## I.      The Government's Case

As relevant to Count Two, the Government introduced extensive evidence at trial—through the testimony of percipient witnesses and video of the events at the Manhattan Planned Parenthood—that Williams used force, threats of force, and physical obstruction to injure, intimidate, and interfere with patients seeking reproductive health services, and providers working to deliver those services on June 19, and June 20, 2020.

Over those two days in June 2020, Williams led and participated in an organized protest outside the Manhattan Planned Parenthood, which services up to 100 patients a day, houses up to 150 staff members, and provides a range of reproductive health services, including abortion, birth control, STI testing, HIV prevention and testing, pregnancy testing, and breast and cervical cancer screening. (Tr. 339:22-340:18, 347:14-15). While planning for the protest, Williams texted Chavannes and others on May 26, 2020 that she did not want Planned Parenthood to receive advance notice of the event because "[w]e do not want them to be prepared with volunteers, nor do we want them to hire protests or change their appointments on those days." (GX 501).

2

### A. Williams Obstructs Entrances

During the incident, Williams repeatedly physically blocked the front and side administrative entrances to the facility. Extensive video surveillance footage of the event recorded Williams physically standing in front of both doors on numerous occasions, (*see, e.g.*, GX 117, GX 122, GX 150, GX 162, GX 187), and directing other protestors to assist with obstructing entrances to the health center, (*see, e.g.*, GX 132, GX 170). Three witnesses present at the protest—including Lauren Betters, a legal observer; Ron Lyman, the head of security for Planned Parenthood of Greater New York; and Adrienne Verrilli, a member of the executive staff who was serving as a volunteer escort—testified that Williams repeatedly blocked both entrances to the clinic, directed other protestors to do the same, and bragged about the protestors' success in blocking access to the facility. (*See, e.g.*, Tr. 143:13-18, 143:25-144:8, 153:15-19, 156:1-7, 156:21-157:4, 158:14-24, 206:15-19, 215:4-6, 220:21-23, 350:24-351:7, 381:22-382:4, 456:21-457:2, 460:11-19). Indeed, Williams celebrated that "out of all the appointments today, only one couple came in" to the facility. (GX 131, 148).

Contemporaneous notes taken by Betters further corroborated Williams and Chavannes's efforts to physically obstruct the doors to the facility on both days. (GX 702). For example, on June 19, 2020, Betters wrote that at 8:02 a.m., "[P]erson enters clinic and cannot get into clinic without nearly both protesters touching her. Volunteers use their bodies as barriers between protesters and entrant." Betters further wrote that at 8:29 a.m. "three protesters [are] inside the baracade [*sic*] and entrant cannot make it in unobstructed." These notes are corroborated by videos depicting Williams and Chavannes blocking the front door of the facility throughout the day. (*See,*

*e.g.*, GX 117).  As a result, Verrilli started directing patients to the administrative door down the block.  (GX 122).

Similarly, on June 20, 2020, Betters wrote that at 8:55 a.m. Williams "states she is blocking the door and refused to move from the door," and described that "people cannot get into the clinic," and the "[s]econd door is completely blocked by [Williams] and she refuses to move."  (GX 702). Betters' notes were corroborated by videos of Williams blocking patients from entering the administrative door.  (GX 150, 187).  At 9:07 a.m., Betters wrote that "someone tries to enter and [Williams] stands in front of the door and doorway when door is able to be opened" at which point Williams "sticks her head into the clinic" and "stand[s] in the entry way when door is open."  (*Id.*).

### B. Williams Threatens Staff

During the protest, Williams also repeatedly threatened Planned Parenthood staff members. On June 19, 2020, Williams stood within inches of the clinic's chief administrative officer and threatened to "terrorize this place" and warned that "we're gonna terrorize you so good, your business is gonna be over mama."  (GX 102).  Similarly, Williams stood within inches of a Planned Parenthood security officer and threatened "war."  (GX 101).  Williams also stated that she and Chavannes would act by "any means necessary."  (GX 171).

### C. Williams Uses Force and Causes Bodily Injury

Finally, on June 20, 2020, Williams used force at the protest, which resulted in bodily injury.  Video surveillance footage of the incident showed that at approximately 6:45 a.m., Williams rammed her way into protective barricades that police had positioned in front of the main entrance to the facility, initially attempting to use her body to break through counter-protestors and

a Planned Parenthood security officer located at the front of the barricade.[1] (GX 158). When Williams was unable to break through, she moved to the side of the barricade to attempt to get inside of the barricades. Williams then pulled the barricade away from the security officer and shoved her way past Verrilli, who was positioned inside of the barricade next to the main entrance. (GX 161). Verrilli braced herself with both of her hands to try and maintain her position at the door, while Williams repeatedly shoved Verrilli to get closer to the clinic entrance. Eventually, Verrilli "got pushed over" when Williams forced herself inside of the barricade and in front of the door. (GX 161; Tr. 365:3-14, 366:20-367:11). Later in the day, just before 9:30 a.m., surveillance video also captured Williams shoving a woman in a pink t-shirt, the color worn by Planned Parenthood volunteers, (GX 156; Tr. 378:10-380:8), and Lyman testified that Williams also "took a swing at one of the security guards," (Tr. 214:5-13).

Williams also used force that resulted in bodily injury to Verrilli by crushing Verrilli's hand in the front door of the clinic. Verrilli testified that, as she attempted to escort a fellow volunteer into the front door, Williams "was leaning on the door to try to keep it shut," and Verrilli was able to "open [the door] a little bit." (Tr. 368:14-22). Surveillance footage of the assault showed Williams pressing her body against the door to prevent Verrilli from escorting the volunteer into the clinic, smashing Verrilli's hand inside. (GX 163, GX 191; *see also* Tr. 368:14-22 ("[Williams] she kept leaning on the door and smashed my hand in the door.")). Verrilli

---

[1] The "counter-protestors" were volunteers from the New York City Rights for Abortion who were present at the Manhattan Planned Parenthood on June 20, 2020. (Tr. 190:6-7; 190:24-191:5; 210:1-15). Verrilli testified that Planned Parenthood sought the assistance of these individuals because "given the situation with Covid, it was really difficult to get volunteers to come . . . and we were just kind of desperate for some help because it was really overwhelming on Friday [*i.e.* June 19, 2020]." (Tr. 360:4-8).

screamed that her hand was being smashed, but Williams continued to shove the door shut on Verrilli's hand while singing "we shall not be moved." (GX 163, GX 191). Verrilli felt the door "smashing on [her] hand," where it kept "letting go and hitting, and letting go and hitting as [Verrilli] was trying to pull the door open to get [her] hand out." (Tr. 372:6-11). Williams "just continued to push on the door" for approximately ten seconds. (GX 191, Tr. 372:18-20). When Williams crushed Verrilli's hand in the door, it took three people, including Verrilli, to pry the door open. (GX 191). As a result of the assault, Verrilli suffered bodily injury including swelling, bruising, stiffness, and pain over a period of several weeks, all of which was corroborated by contemporaneous images of her hand, as well as medical records. (GX 355, GX 386; Tr. 373:2-8, 374:8-16).

## II.     The Defense Case

The defense entered several exhibits, including videos taken from the protest, which showed the defendant and Chavannes praying, dancing, and singing, among other things. (*See, e.g.*, DX U, DX X; Tr. 185). The defense did not call any witnesses. (Tr. 685, 687). At the close of the defense case, the defendants moved for a judgment of acquittal, which the Court denied. (Tr. 677:3-13, 23).

## III.    Jury Deliberations and Verdict

On February 21, 2024, the case was submitted to the jury for deliberation. On February 22, 2024, the jury submitted a note ("Jury Note-1") to the Court that stated in part:

> Count Two, Williams. Does defendant have to be found guilty of all four elements, including bodily injury, to be guilty of clinic access obstruction? So, if element four is not met, must the Williams defendant be found not guilty of Count Two while Chavannes can be guilty of Count Three without a finding bodily injury? (Tr. 886).

In response, the Court reminded the jury that with respect to Count Two against Williams, they must find the Government had proven four elements beyond a reasonable doubt to convict the defendant, including bodily injury, while with respect to the similar count against Chavannes, they must find only that the Government had proven three elements beyond a reasonable doubt, since that count did not require a finding of bodily injury. (Tr. 889:22-890:4). The Court further reminded the jury that they were to consider both counts separately in reaching their verdict as to each. (Tr. 890:4-9).

The Court subsequently received another jury note ("Jury Note-2") which stated, in sum and substance, that Juror Number Two was not feeling well and "feel[s] she cannot continue being a juror any more." (Tr. 895:7-8). When questioned by the Court, Juror Number Two informed the Court that she had been feeling unwell since during the jury deliberations there was "too much commotion in the room, too much noise, and the jurors all like out of control . . . disagreement and things like that." (Tr. 889:22-900:2). The juror reported a history of brain aneurysms that she was concerned could be affected by the anxiety she was feeling. (*Id.*) The juror then received medical attention by both the courthouse nurse and emergency medical services, and the jury subsequently continued deliberating. (Tr. 906-09, 912).

Later that afternoon, the jury convicted Williams on Count Two and acquitted Williams on Count One. (Tr. 915) The jury acquitted Chavannes on all counts. (*Id.*).

## ARGUMENT

### I. The Court Should Deny the Defendant's Rule 29 Motion

The evidence presented at trial proved beyond a reasonable doubt that the defendant was guilty of using force, threats of force, and physical obstruction to injure, intimidate, and interfere with patients and providers of reproductive health services at the Manhattan Planned Parenthood.

As set forth above, that evidence included, among other things, the testimony of several witnesses—including Verrilli, a victim whom the defendant physically injured—who were present at the clinic during the protest and witnessed the incident firsthand. In addition, the evidence included dozens of video recordings depicting the defendant engaging in obstructive conduct at the clinic and informing others of her intent to do the same.

In seeking to overturn the jury's verdict, the defendant challenges her verdict on the ground that, among other things, video evidence shows the defendant "mov[ing] out of the way of people approaching the door so that the door could be opened and shut to allow entry and exit to Planned Parenthood." (Def. Br. at 5-6). In addition, the defendant argues that the defendant "had no intent to injure Ms. Verrilli" and challenges whether the defendant caused "any injury" to Verrilli. (Def. Br. at 6-7). The defendant's arguments are meritless. The extensive evidence in this case, including video evidence and witness testimony, clearly establishes that the defendant obstructed access to the Manhattan Planned Parenthood and intentionally used force against Verrilli, which resulted in injury. The Court should therefore deny the defendant's Rule 29 motion.

## A. Applicable Law

A defendant challenging the sufficiency of the evidence "bears a heavy burden." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (quoting *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008)). A conviction must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)). The Court cannot disturb a jury's verdict unless "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt

8

beyond a reasonable doubt." *United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) (internal quotation marks omitted).

On this motion, the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (internal quotation marks omitted). The Court must analyze the pieces of evidence "in conjunction, not in isolation," *Persico*, 645 F.3d at 104 (quoting *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008)), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *Cuti*, 720 F.3d at 462 (quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999)). Moreover, a court cannot "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Guadagna*, 183 F.3d at 129 (internal quotation marks omitted).

## B. Argument

The defendant argues that the Government failed to introduce sufficient evidence that the defendant blocked doors at the clinic, arguing instead that "[t]he video evidence was clear that Ms. Williams moved out of the way of people approaching the door so that the door could be opened and shut to allow entry and exit to Planned Parenthood." (Def. Br. at 5-6). The defendant's claim ignores the vast majority of the evidentiary record and should be rejected out of hand.

As described above, extensive video surveillance footage of the events in question depicted Williams repeatedly obstructing both the front and side doors of the clinic, (*see, e.g.*, GX 117, GX 122, GX 150, GX 162, GX 187), as well as directing other protestors to assist with obstructing

entrances, (*see, e.g.*, GX 132, GX 170).[2]  This video footage is further corroborated by the testimony of Betters, Lyman, and Verrilli, who were present at the protest and each testified that Williams blocked both entrances to the clinic, directed other protestors to do the same, and bragged about the protestors' success in blocking access to the facility.  (*See, e.g.*, Tr. 143:13-18, 143:25-144:8, 153:15-19, 156:1-7, 156:21-157:4, 158:14-24, 206:15-19, 215:4-6, 220:21-23, 350:24-351:7, 381:22-382:4, 456:21-457:2, 460:11-19).  Betters' contemporaneous notes of the incident further corroborated that Williams repeatedly blocked the front door of the clinic on June 19, and, on June 20, repeatedly directed other protestors to block the administrative door to the facility, and then herself went to the administrative door to block access to patients where she "refused to move from the door."  (GX 702).

The defendant next argues that she "had no intent to injure Ms. Verrilli and did not have an opportunity to form such an intent" and contests whether the defendant caused "any injury" to Verrilli.  (Def. Br. at 6-7).  Again, the evidence introduced at trial belies both of these claims.  As described above, Verrilli testified that as she attempted to escort a fellow volunteer into the front door, Williams pressed her body against the door to prevent the escort from entering, smashing Verrilli's hand inside.  (GX 163, GX 191).  Despite Verrilli screaming that her hand was being smashed, Williams continued to shove the door shut on Verrilli's hand while singing "we shall not be moved."  (GX 163, GX 191).  This testimony and the video evidence easily permitted the jury to infer that Williams had the requisite intent to cause injury.  Further, contrary to the defendant's

---

[2] Whether or not Williams temporarily ceased blocking the doors during the two-day period on June 19, and June 20, 2020 is of no moment.  As the Court correctly instructed the jury, "obstruction need not be permanent or entirely successful" in order to constitute "physical obstruction" under the FACE Act.  (Tr. 849:7).

claim, Williams action was not a momentary accident and caused actual injury. Williams "continued to push on the door" with full force for approximately ten seconds while Verrilli's hand was trapped inside, requiring three people, including Verrilli, to pry the door open. (GX 191; Tr. 372:18-20). As a result of the assault, Verrilli suffered bodily injury including swelling, bruising, stiffness, and pain over a period of several weeks, which was corroborated by contemporaneous images of her hand and medical records. (GX 355, GX 386; Tr. 373:2-8, 374:8-16).

The defendant's use of force against Verrilli was also not aberrational. Earlier that same day, the defendant used force against Verrilli and other Planned Parenthood staff in trying to ram her way past protective barricades in order to position herself in front of the entrance to the facility. (GX 158, GX 161). Surveillance video also captured Williams shoving an apparent Planned Parenthood volunteer, (GX 156; Tr. 378:10-380:8), and Lyman testified that Williams "took a swing at one of the security guards," (Tr. 214:5-13). These incidents further establish that the defendant's use of force against Verrilli was not accidental.[3]

---

[3] The defendant wrongly claims that she was, herself, the victim of physical violence during the protest. The extensive video evidence introduced at trial fails to show, as the defendant contends, that Williams was "struck by counter-protestors throughout the two days of protests." (Def. Br. at 4). To the contrary, surveillance footage shows that the defendant used force against other Planned Parenthood staff and volunteers, as described above. (GX 156, GX 158, GX 161; Tr. 214:5-13). Similarly, the defendant claims that Verrilli "forcibly pushed Ms. Williams during the protest on June 19, 2020," (Def. Br. at 5), when, in fact, it was the *defendant* who used force to shove her way past Verrilli, who was positioned inside of the barricade next to the main patient door, (GX 161; Tr. 450:22 ("I'm holding my ground as [Williams is] pushing into me.") (Verrilli testimony)). Finally, the defendant's claim that Verrilli "struck Ms. Williams while her back was turned," (Def. Br. at 6), prior to the defendant crushing Verrilli's hand was repeatedly discredited through both video evidence and witness testimony introduced at trial, (GX 163, GX 191; Tr. 441:9-12 ("Q. Your testimony is that you didn't open the door and strike her with the door? A. I did not strike her with the door. She was leaning on the door.") (Verrilli cross examination)).

In sum, the Government's evidence clearly established at trial that the defendant repeatedly obstructed access to the clinic and caused bodily injury to Verrilli. The jury's verdict that Williams was guilty of Count Two was supported by ample evidence and accordingly, the Court should deny the defendant's Rule 29 motion.

## II. The Court Should Deny the Defendant's Rule 33 Motion

The defendant also contends that the Court should overturn the jury's verdict because it constituted an "improper compromise." (Def. Br. at 8). Not so. The jury carefully weighed the evidence in this case and their legally valid verdict should not be disturbed.

### A. Applicable Law

Rule 33 authorizes district courts to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim P. 33(a). Because "motions for a new trial are disfavored in this Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), a district court, after examining the totality of the evidence and considering objectively all of the facts and circumstances, should grant the motion only if the court finds "a real concern that an innocent person may have been convicted," *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). "It is only when it appears that an injustice has been done that there is a need for a new trial in the interests of justice." *Id.* (internal quotation marks omitted). Although granting such a motion is in the court's discretion, "that discretion should be exercised sparingly." *Id*.

"[A] district court may not grant a Rule 33 motion based on the weight of evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020) (internal quotation marks omitted). Under this standard, the Second Circuit has "emphasized" that the remedy of a new trial should be granted "sparingly and in the most

extraordinary circumstances." *Id.* (internal quotation marks omitted). A district court "must be careful not to wholly usurp the role of the jury, and should defer to the jury's assessment of witnesses and resolution of conflicting evidence unless exceptional circumstances can be demonstrated." *United States v. Teman*, 465 F. Supp. 3d 277, 292 (S.D.NY. Jun. 5, 2020) (internal quotation marks omitted). Exceptional circumstances are limited to, for example, "where testimony is 'patently incredible or defies physical realities,' although the district court's rejection of trial testimony by itself does not automatically permit Rule 33 relief." *United States v. Schlesinger*, 390 F. Supp. 2d 274, 275 (E.D.N.Y. 2005) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)). In addition, "as it must do under Rule 29, a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis." *Archer*, 977 F.3d at 189.

Further, whether the jury reached a split verdict, or even an inconsistent verdict, is not a sufficient basis, absent more, to vacate a jury's verdict. The United States Supreme Court has long held that inconsistency or compromise in a jury verdict does not provide a sufficient basis for setting it aside. *See United States v. Powell*, 469 U.S. 57, 69 (1984) (reaffirming general rule that inconsistent verdicts can stand); *Harris v. Rivera*, 454 U.S. 339, 345 (1981) ("Inconsistency in a verdict is not a sufficient reason for setting it aside."); *Hoag v. New Jersey*, 356 U.S. 464, 472 (1958) ("[J]ury verdicts are sometimes inconsistent or irrational."); *United States v. Dotterweich*, 320 U.S. 277, 279 (1943) ("Whether the jury's verdict was the result of carelessness or compromise or a belief that the responsible individual should suffer the penalty instead of merely increasing, as it were, the cost of running the business of the corporation, is immaterial. Juries may indulge in precisely such motives or vagaries"); *Dunn v. United States*, 284 U.S. 390, 393

(1932) ("Consistency in the verdict is not necessary"). *Cf. Ulster County Court v. Allen*, 442 U.S. 140, 168 (1979) (Burger, C.J., concurring) ("Courts have long held that in the practical business of deciding cases the factfinders, not unlike negotiators, are permitted the luxury of verdicts reached by compromise").

The Second Circuit, in applying the Supreme Court's precedent, has similarly found that an inconsistent verdict, or a verdict that appears to have been the result of jury compromise, is not grounds for vacatur under Rule 33. *See United States v. Stone*, No. 05 Cr. 401, 2008 WL 420008, at \*3 (E.D.N.Y. Feb. 11, 2008), *aff'd sub nom. United States v. Nieves*, 354 F. App'x 547 (2d Cir. 2009) (noting that "[t]hat the conviction may have been the result of some compromise is, of course, possible; but to consider so is to consider too curiously, unless all verdicts are to be upset on speculation" (citing *Steckler v. United States*, 7 F.2d 59, 60 (2d Cir. 1925)); *United States v. Townsend*, No. S1 06 Cr. 34 (JFK), 2007 WL 2936308, at \*5 (S.D.N.Y. Oct. 4, 2007), *aff'd sub nom. United States v. Mercado*, 573 F.3d 138 (2d Cir. 2009) (denying Rule 33 motion finding that the fact that the jury returned a "split" verdict does not alone show that witness' testimony was "patently incredible" or incompatible with "physical realities"); *United States v. Acosta*, 17 F.3d 538, 545 (2d Cir. 1994) (noting that the *Powell* court rejected as "imprudent and unworkable a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them. Such an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." (internal citations, alterations, and quotations omitted)). *See also United States v. Valpais*, No. 05 Civ. 4373 (DC), 05 Civ. 4374 (DC), 96 Cr. 865 (DC), 2007 WL 1998942, at \*7

14

(S.D.N.Y. July 10, 2007) (noting that "'[a]s long as a conviction is the result of a fair trial at which legally sufficient evidence has been adduced, its inconsistency with another verdict does not create a constitutional defect.'") (quoting *Billups v. Costello*, No. 91 Civ. 6296, 1992 WL 170650, at *4 (S.D.N.Y. July 6, 1992)).

### B. Argument

Williams argues that she is entitled to a new trial because the jury reached an "improper compromise" when it returned a split verdict in this case. (Def. Br. at 8-10). Specifically, the defense argues that Jury Note-1, pertaining to the elements of Counts Two and Three, reflects that the jury "had determined that Ms. Williams had not, in fact, caused physical injury to Adrienne Verrilli." (Def. Br. at 8). The defendant further argues that since the jury returned a split verdict shortly after Jury Note-2, related to the medical circumstances of Juror Number Two, "the verdict appears to have been an improper compromise," since "[t]he fact that the verdict contradicted the first note" reflects "the improper influence that the juror's treatment had upon the jury in reaching a compromise verdict." (Def. Br. at 9-10).

The defendant's arguments amount to nothing more than rank speculation as to what was taking place in the jury room and fall far short of establishing a basis for a new trial. That the jury initially asked a legal question about the elements of Count Two, and then subsequently convicted Williams on that count, does not reflect any improper juror conduct. If anything, the jury's question shows that the jury carefully reviewed the Court's instructions as to the law and was continuing to do so when it submitted Jury Note-1. After receiving further clarification on the applicable law, the jury continued deliberating before reaching its verdict and ultimately reached a verdict that was amply supported by the evidence. Nor is there anything inconsistent between

15

Jury Note-1 and the fact that the jury ultimately acquitted Chavannes, while convicting Williams. The jury was instructed to consider their verdict as to each offense separately, (Tr. 889:22-890:9), and appropriately weighed the evidence against each defendant independently, in reaching their verdict. There was nothing inherently inconsistent or improper in doing so.

Finally, the defendant reads far too much into the fact that the jury's verdict came a few hours after Juror Note-2, in which Juror Number Two indicated they were not feeling well and that there was "commotion" in the jury room. That juror received medical attention and returned to jury deliberations without issue. Defense counsel also made no objection to the jury continuing their deliberations. (Tr. 907-909). In any event, even if the jury's verdict was inconsistent or a result of compromise, that would not provide a sufficient basis for vacating the jury's decision. Indeed, "[w]hether the jury's verdict was the result of carelessness or compromise . . . is immaterial." *Harris*, 454 U.S. at 345 n.14 (1981). *See also Stone*, 2008 WL 420008, at *2-3. Similarly, the jury's verdict, even if inconsistent, should not be set aside. *See Harris*, 454 U.S. at 345; *Townsend*, 2007 WL 2936308, at *5. Accordingly, irrespective of whether the jury's verdict presents legal inconsistencies, or may have been the result of jury compromise, the Court should properly deny the defendant's request for a new trial pursuant to Rule 33.

## **CONCLUSION**

For the foregoing reasons, the defendant's motions should be denied.

Dated: New York, New York
April 15, 2024

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
for the Southern District of New York

By:        /s
Emily A. Johnson
Mitzi Steiner
Assistant United States Attorneys
(212) 637-2409/-2284