UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 22 Cr. 684 (JLR)

BEVELYN BEATTY WILLIAMS,

Defendant. Sentence

------------------------------x

New York, N.Y.
July 24, 2024
10:30 a.m.

Before:

HON. JENNIFER L. ROCHON,

District Judge

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
MITZI STEINER
EMILY JOHNSON
Assistant United States Attorneys

CALVIN SCHOLAR
Attorney for Defendant

(In open court; case called)

THE DEPUTY CLERK: Counsel, please state your name for the record.

MS. STEINER: Good morning, your Honor. Mitzi Steiner and Emily Johnson for the government.

THE COURT: Good morning.

MR. SCHOLAR: Good morning, your Honor. Calvin Scholar for Ms. Williams, who is standing next to me.

THE COURT: Good morning.

Good morning, Ms. Williams.

Ms. Williams, let me give you an overview of what we are going to do here today.

First, I am going to go over the materials that I have received, and I am going to deal with the presentence report. Then I am going to review the sentencing guidelines calculations. That can get a little bit technical, and we are going to go back and forth and have some argument because there are some issues that have been raised with respect to the guidelines calculations, so we will do that for a bit of time. Then I will hear from the government about anything they would like to say to me in support of their submission to me. And then I will hear from your counsel about anything he would like to add with respect to his sentencing submission. And then I am happy to hear from any victims, if they are here. And then I am happy to hear from you, Ms. Williams, if you would like to

be heard.

Then I will review any departures or variances from the guidelines range, and I am going to review the sentencing factors that I must consider in imposing a reasonable sentence that is sufficient, but no greater than necessary, to achieve the goals of sentencing.

After I go through all of those factors, and my analysis of those factors as applied in this case, finally then I will impose the sentence.

So that's how we are going to proceed today.

Let me start with the materials that I have received.

So, first, I have a submission from defense counsel that is dated July 10, 2024. It also contains a mitigation report submitted by CVA Consulting Services. The submission also contains numerous letters of support for Ms. Williams, from her sisters, her husband, friends, others.

I also received additional letters of support for Ms. Williams, including from her husband, from Ms. Chavannes, from others, and I received those letters. Whenever I would receive a letter into chambers, I would make sure that it was sent directly to counsel for defense and the government. I have all those. I have read all of those.

Are there any other letters or anything, Mr. Scholar, that I need to take into consideration?

MR. SCHOLAR: No, your Honor. I believe you have them

all.

THE COURT: Thank you.

I did read all of them very closely, and they are very important to me in understanding more about Ms. Williams. So thank you for sending those in. And thank you to anyone in the audience who sent those in.

From the government, I received a sentencing submission dated July 17. It's dated 2023. I believe it's 2024. I have received that sentencing submission, and it includes a statement from Planned Parenthood of Greater New York.

I also have a final presentence report that is dated May 14, 2024 from the probation department.

Ms. Steiner, have you received all of the documents that I have gone over here today?

MS. STEINER: I have, your Honor.

THE COURT: And are there any further documents that I need or materials that I need to be considering here today?

MS. STEINER: Not from the government, your Honor.

THE COURT: Mr. Scholar, have you received all of those documents I have just described?

MR. SCHOLAR: I have, your Honor.

THE COURT: Are there any other materials that I should be considering here today?

MR. SCHOLAR: No, your Honor.

THE COURT: Thank you very much.

Ms. Steiner, are there going to be any victims present or making a statement here today?

MS. STEINER: Your Honor, we anticipated that Planned Parenthood may have a representative here. They don't currently appear to be in the courtroom. If they do arrive, we will notify your Honor as soon as they do.

THE COURT: Thank you very much.

Mr. Scholar, have you read the presentence report and discussed it with your client?

MR. SCHOLAR: I have, your Honor.

THE COURT: May I address your client directly?

MR. SCHOLAR: Yes, your Honor.

THE COURT: Ms. Williams, have you read the presentence report from the probation department?

THE DEFENDANT: Yes.

THE COURT: Have you discussed it with your lawyer?

THE DEFENDANT: Yes.

THE COURT: You have had enough time to talk it over with your lawyer?

THE DEFENDANT: Yes.

THE COURT: Thank you very much. Please be seated.

In terms of the presentence report, let's get into that first.

I see on page 25 of the presentence report——I'm sorry,

excuse me——page 30 of the presentence report that there are no objections by the government to the presentence report.

Is that correct, Ms. Steiner?

MS. STEINER: Your Honor, that's correct, with respect to the factual recitation in the PSR. As we noted in our submission, we do object to the criminal history calculation.

THE COURT: Correct. And we will get to that. Thank you.

Then, Mr. Scholar, I see on that same page that there are no objections from defense, but I do see a few objections that came in in your submission. Is that correct?

MR. SCHOLAR: That's correct, Judge.

THE COURT: We will go over those. So thank you.

But in terms of the factual recitation in the presentence report, are there any objections to that?

MR. SCHOLAR: No, your Honor.

THE COURT: Thank you.

All right. Let's go through that a bit.

So, some of this, as I said, Ms. Williams, is going to sound very technical, because we have to go through different provisions of the sentencing guidelines and there are certain numbers associated with that. So we are going to do that right now.

Defendant was convicted of Count Two of the indictment, a substantive violation of 18 U.S.C. 248, the

Freedom of Access to Clinic Entrances Act. The PSR reflects a total offense of 19 and a criminal history category of II.

Let's start with defendant's objections first.

As I understand it, defendant argues that probation should not have used the base offense level for aggravated assault and should have instead used the base offense level under the sentencing guidelines 2H1.1(a)(4) or (3), which would have levels of 6 or 10, respectively. And the government does not agree. So why don't we talk about that one first.

Mr. Scholar, do you have any additional argument you would like to give me on that? Because it seems to me that this is an aggravated assault, and you can tell me why it's not, and that we need to go to that guideline under the plain terms of 2H1.1(a).

MR. SCHOLAR: Your Honor, our view of the guidelines is that the criminal conduct is within the guideline itself, it's considered in the guidelines. Based upon the video, the testimony that came out at trial, we would not agree that it was felonious assault, just based upon the testimony that came out at trial as well as the video itself.

I don't want to go through it and belabor the trial. We had a long and lengthy trial with respect to what happened. The Court has seen the videos, I am sure.

THE COURT: Many times.

MR. SCHOLAR: Same here, Judge. I have watched them

too many times.

Basically, on the video, Ms. Williams is standing with her back to the door. It's not something that she directly went to the incident, to the location, looking to injure people or looking to use the door or use a weapon in order to espouse her beliefs or punish other persons for having different beliefs than her own.

So we would argue that the guidelines actually contemplate the criminal conduct in its actual guideline. So using a cross-reference would not be appropriate.

THE COURT: So how do you address, then, 2H1.1(a)(1) that says that I am to apply the greatest of the offense level from the offense guidelines applicable to any underlying offense or, and then they give other alternatives? Why wouldn't an applicable offense here be an aggravated assault?

MR. SCHOLAR: Just for the reasons I just said. It is demonstrated through the video, through both days of videos. It's clear that Ms. Williams did not go to the incident location looking to injure people, or using weapons, or using the doors to hurt or harm people that passed by her. Many people are shown walking directly past her. She is moving out of the way. This, for whatever reason, was an incident that happened. It wasn't something that looks like it was contemplated. It doesn't look like it's something that she planned out to happen.

So with respect to the underlying reasons for the statute, as well as the fact that it's contemplated within the guideline itself, we would ask that the Court not consider the cross-reference because that would be greater than necessary.

THE COURT: And which offense level would you be proposing?

MR. SCHOLAR: I propose 6. I said in my papers 6 or 10 would be appropriate based upon the jury's verdict.

THE COURT: Thank you very much.

Let me hear from the government in response.

MS. STEINER: Thank you, your Honor.

Your Honor, the government is in full agreement that the aggravated assault guideline here is appropriate. As your Honor is aware, 2H1.1 is the provision that would apply to any offense involving individual rights, which can obviously have a broad range of conduct, from a color of office involving a police officer's conduct, to a voting rights offense, to what we have here. And so the provision intentionally permits, and in fact requires, cross-references to more applicable guidelines.

And here, the aggravated assault with a dangerous weapon, here being the door, was at the heart of the most egregious conduct that the defendant participated in. We rehashed this many times. From the government's perspective, the evidence that was introduced at trial could not have been

clearer, both with respect to the fact that the defendant caused injury to Ms. Williams and also with respect to the defendant's intent in doing so.

As captured on video——and this is Government Exhibit 163 and Government Exhibit 191——Ms. Williams continued to crush Ms. Verrilli's hand in the door, for upwards of 10 seconds, while Ms. Verrilli was crying out in pain that she was being injured. It took three individuals to pry the door open, which reflects the sheer amount of force that the defendant continued to exert on the door, even after Ms. Verrilli indicated that she was in pain. And I think also, significantly, the Court saw other evidence at trial where the defendant was willing to use force on other occasions, for example, grabbing the barricade from a security officer and trying to shove her way to a front door. That shows that what the defendant was doing here was deliberate and that she was willing to use force on that day to achieve her objectives.

With respect to -- I don't want to get into this in too much detail, unless the Court has additional questions, but, certainly, even a 2H1.1(a)(4) application would certainly be appropriate, given that 2H1.1(2) would involve an offense involving two or more participants, which we clearly have here. But I don't think we should reach that juncture because, as I have stated, the Court is required under 2H1.1(a) to impose a greater base offense level that is appropriate; and here, from

the government's perspective, it clearly is based on the undisputed evidence at trial.

THE COURT: Thank you.

Mr. Scholar, going back to you for a minute. We talked a little bit about the base offense level. Let's set that to the side for a moment, and I will make my decision on that. But do you dispute that there was bodily injury that resulted from this?

MR. SCHOLAR: Judge, no, that's not in dispute based upon the jury's verdict.

THE COURT: That's what I thought.

Finally, let's talk a little bit about the role adjustment. There is a proposed two-point role adjustment because the defendant was an organizer, leader, manager, or supervisor in the criminal activity under 3B1.1(c).

What is your position on that?

MR. SCHOLAR: Your Honor, as we stated in our papers, we are not in agreement that a role adjustment is appropriate under these facts. Ms. Williams was loud, obviously, at the incident. She was boisterous. But, based upon the evidence and the testimony the Court heard, there are several groups that came together, several disparate groups that came together, both on the side of abortion rights as well as the protesters. And these people appeared to have acted independently of one another. Considering the testimony from

the security agent from Planned Parenthood, these were different groups, and it didn't appear that anyone had any control over anyone.

So, with respect to Ms. Williams, it doesn't appear that she guided anyone or required anyone to do anything. People just showed up at an event knowing there would be a general protest and events happened from there.

THE COURT: Let me hear from the government.

Thank you, Mr. Scholar.

MS. STEINER: Thank you, your Honor.

Your Honor, under 3B1.1 and Application Note 2, a Court only needs to find that Ms. Williams led, managed, supervised, organized activity of just one other participant, and that clearly was established at trial here in many different respects.

At a minimum, at trial, there was evidence that Ms. Williams directed and managed the activity of Ms. Chavannes. In addition, there was significant evidence that Ms. Williams coordinated the many other individuals that were present that day, starting from the text message communication that she had with multiple individuals about showing up to the protest and concealing the fact that they were going to be present prior to the protest in order to not allow Planned Parenthood to be prepared in advance. That was at Government Exhibit 501.

The defendant also, during the two-day protest,

clearly managed throughout the activities of the other individuals present, in directing them to blockade both doors of the facility. I would direct the Court to Government Exhibits 135, 137, 149, and 170. In each of these, the defendant is seen on video directing other individuals, far more than one, to block the various doors of the facility.

THE COURT: Thank you.

Mr. Scholar, anything else that you would like to add with respect to any objections to the guidelines range? We are not at criminal history yet. But with respect to the guidelines range, any other arguments that you would like to add or anything you would like to add?

MR. SCHOLAR: Just that with respect to any role adjustment, Ms. Williams did not have any superior ability to force or order anybody to do anything. Ms. Chavannes appeared to be an independent actor. She didn't have any greater or less independence based upon Ms. Williams's presence. And it's clear from the video, Judge.

That's all I wanted to say, Judge.

THE COURT: Thank you very much.

Does the government have anything else to add with respect to the sentencing guidelines arguments?

MS. STEINER: No, your Honor. Thank you.

THE COURT: All right.

I have reviewed the PSR. I have looked at the

submissions from both parties, and I have heard from both sides. Thank you very much for the presentations, and I find the following.

Sentencing guidelines 2H1.1(a)(1) directs the Court to apply the greatest of "the offense level from the offense guideline applicable to any underlying offense" and those listed in 2H1.1(a)(2) to (4). The underlying offense is the "offense guideline applicable to any conduct established by the offense of conviction that constitutes an offense under federal, state or local law," according to Application Note 1 of the sentencing guidelines at 2H1.1.

I do find that I should look to the cross-referenced offense level for an underlying offense, and the most analogous offense guideline here is aggravated assault under 2A2.2 because it was an assault with a dangerous weapon with intent to cause bodily injury and not just frighten. This has a base offense level of 14 under 2A2.2(a). Then there should be a three-level increase, which is warranted under 2A2.2(b)(3)(A) because Ms. Verrilli sustained bodily injury to her hand, including swelling, bruising and pain for several weeks. Defendant does not object to that finding at least. That leads to a base offense level of 17, which is greater than the 10 or 6 levels under 2H1.1(a)(2)(B).

I do agree with the government that a door like the one that Ms. Williams pressed against Ms. Verrilli's hand

qualifies as a dangerous weapon. A dangerous weapon "includes any instrument that is not ordinarily used as a weapon (e.g., a car, a chair, or an ice pick), if such an instrument is involved in the offense with the intent to commit bodily injury." U.S. Sentencing Guidelines Section 2A2.2, comment 1.

The government provides in its submission at page 7 numerous examples of cases where courts have held that ordinary objects were considered dangerous weapons, such as a tennis shoe, a broom, a heavy pitcher, and a metal chair. Indeed, in *United States v. Sherwin*, 271 F.3d 1231, 1233-35 (10th Cir. 2001), the court held that the district court properly utilized 2A2.2 as the guidelines section for aggravated assault where the defendant kicked a patrol car door into a policeman.

So, too, here, Ms. Williams pressed a substantial door, as opposed to a screen door or other opening cover, against Ms. Verrilli's hand while Ms. Verrilli was yelling that her arm was stuck. Instead of moving, Ms. Williams sang "We Shall Not be Moved," and pressed back on the door so hard that three people had to try to pry it open. After Ms. Verrilli had freed her hand, the video shows Ms. Williams smiling, almost smirking at the camera. This shows the use of a dangerous weapon with the intent to commit the bodily injury. Therefore, 17 is the correct base offense level.

The Court also finds that the two-point adjustment is appropriate here because Ms. Williams was an organizer, leader,

manager, or supervisor of the criminal activity under 3B1.1(c). Regardless of whether Ms. Williams's agreement with others reached the level of a criminal conspiracy——I need not find that and the jury rejected that with respect to Count One——Ms. Williams still led, managed, or supervised at least one individual in the criminal activity.

I find that, based on the evidence that was introduced at trial and as set forth by the government in page 8 of its submission, that the defendant organized the event on June 19 and 20, instructed others to keep the event quiet so that Planned Parenthood would not be prepared with extra volunteers, and directed others during the event on when and where to block doors, or assist in blocking doors, during those days. There is an ample factual basis for this role adjustment.

The cases cited by defendant do not support a contrary conclusion. In *United States v. Jordan*, 291 F.3d 1091 (9th Cir. 2002), the circuit reversed the enhancement because the factual record supported only that the defendant had a strong personality, while his nephew was more deferential, rather than any factual basis that the defendant had a leadership role in operating, in that case, a meth lab. Mr. Scholar is right that having a strong personality or being loud is not sufficient, and that is not what I am finding here. The focus must be on the actions taken by the defendant. The aforementioned actions of Ms. Williams that I just described and that were presented

at trial satisfy this standard. I watched the videos of Ms. Williams leading and directing others in the activities of June 19 and 20, planning beforehand, telling people to go to various doors, directing activities.

*United States v. Sostre*, 967 F.2d 728 (1st Cir. 1992)——a case cited by defendant——is also not persuasive to the Court. In *Sostre*, the court found that the records showed that the defendant was a steerer or someone who directs drug dealers to sellers because the sellers are attempting to conceal themselves from casual observation, and, therefore, the steerer lacked control over others and was not a manager or supervisor. Ms. Williams, in contrast, planned the activities, instructed others to keep them secret, was central in the blocking of the entrances, and directed and instructed others as to when and where they should go in order to block entrances. This behavior qualifies for the enhancement.

Therefore, the correct offense level here is 19.

Next, the government has an objection that the defendant's criminal history category should be III instead of II because the Tennessee conviction should be counted as one criminal history point, and the Tennessee conviction was not part of the offense of conviction here, and, therefore, should be counted as a one-point conviction under 4A1.1(c).

Can I hear from the government if there is anything further that you wish to add?

MS. STEINER: Your Honor, I am happy to answer any questions. I don't think there is anything we wanted to add other than to direct the Court to Section 1B1.1(2), which I think is what your Honor was referencing a moment ago, which requires that a criminal history be included, unless it occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense. Here, the conduct occurred from July 19 to 20 of 2020 in New York. The conduct at issue in the Tennessee conviction occurred in Nashville in 2022, at an entirely different facility, and was not taken into account by the offense of conviction, which was only Count Two, the substantive count as to the New York incident.

THE COURT: Thank you.

Mr. Scholar, I don't think you had an opportunity since the government's papers came in after you. Do you have a response to that?

MR. SCHOLAR: Your Honor, I understand the government's position. However, we would just ask the Court to exercise its discretion in imposing a sentence to contemplate a variance or departure.

THE COURT: I see. And I will take that, and I am going to go through the variance and departure arguments that are made, but I am also required, as you know, to accurately

determine the sentencing guidelines before I do that. And so, in terms of whether there should be an additional one point for the Tennessee conviction, do you have any objection to that for a guidelines calculation?

MR. SCHOLAR: For a guidelines calculation, no.

THE COURT: Thank you very much.

I do agree with the government that the Tennessee conviction for which defendant was sentenced to 30 days in prison in 2022 warrants an additional criminal history point under 4A1.1(c); and, therefore, defendant has a criminal history score of four and a criminal history category of III.

So, based on all of that, and resolving the objections that were raised to me, I find that the appropriate offense level is 19, the criminal history category is III, and the guidelines range here is 37 to 46 months in prison.

Ms. Steiner, are there any other guidelines arguments that I have not addressed or any further objections to the guidelines calculations in the PSR?

MS. STEINER: No, your Honor.

THE COURT: Mr. Scholar, any other guidelines arguments that I haven't addressed or other objections that you have to the PSR guidelines calculations?

MR. SCHOLAR: No, your Honor.

THE COURT: Thank you.

The Court will therefore adopt the presentence report

and the factual findings in the presentence report with a change to the criminal history score to four and Criminal History Category III. It will be made part of the record in this matter and placed under seal. If an appeal is taken, counsel on appeal may have access to the sealed report without further application of the Court.

Now, let's talk next about departures, and we will get to variances, but let's do departures first.

I understand or at least I am construing Mr. Scholar's submission that he is seeking a downward departure based on 5H1.6. So I would like to talk about that.

I also understand that the government agrees with probation that an upward departure under 5K2.0(a)(1) is appropriate, but that the government does not seek such a departure, arguing instead that a departure is not warranted and a guidelines range sentence is sufficient, but not greater than necessary, to meet the purposes of sentencing.

Taking that latter point first, Ms. Steiner, am I characterizing the government's position with respect to a departure accurately?

MS. STEINER: Yes, your Honor.

THE COURT: So, let's talk about the upward departure first. Given that the government is not pressing for it, I do not intend to grant an upward departure, and, therefore, I need not address the propriety of an upward departure.

Now let's turn to defendant's request for a downward departure under 5H1.6.

Mr. Scholar, anything that you would like to add to your papers on that?

MR. SCHOLAR: Your Honor, yes. As the Court is aware from our papers, we did draw a distinction for Ms. Williams based upon her role as a mother. I just wanted to make it clear that I don't want it to seem like I am trying to explain motherhood. But what we were trying to get at in citing those cases was not that courts have determined that a departure is only justified if there is no one on the planet earth that can care for the children. It's just that judges in the past have used that departure, especially the Second Circuit, in looking at a mother's unique role of guidance and her place in the family.

In this situation, Ms. Williams is a stay-at-home mother. Her husband works full time. They have no other family in Tennessee. There is no one else that can care for the child. So that was our view of bringing that to the Court's attention and asking for a departure.

THE COURT: Thank you, Mr. Scholar.

Ms. Steiner.

MS. STEINER: Yes, your Honor.

The government is opposing any downward departure under 5H1.6, which specifically states that under the

guidelines a policy statement should not be applied. In ordinary circumstances, the case law is clear that it can only be applied where factors are extraordinary. That's *U.S. V Alba*, 933 F.2d 1117 (2d Cir. 1991). And the Second Circuit has also found in *United States v. Johnson* that ordinary family responsibilities, as we have here, do not warrant a departure.

The cases that the defense cited in its submission, as the government noted, involve very different circumstances, where there were other extraordinary factors beyond a defendant being removed from the family unit. That does not appear to be the case here.

So, for those reasons, your Honor, the government does not believe any downward departure would be appropriate.

THE COURT: Thank you very much.

Anything further, Mr. Scholar?

MR. SCHOLAR: Your Honor, just that, in looking at the departure, it's not required that there be some type of hurdle or some type of, you have to have five kids or you have to have a child with a disability. It's anything that's extraordinary. And with respect to Ms. Williams, her role, the statistics of women being a minority in the criminal justice system, her role as a mother, her role as a caregiver, it is extraordinary.

THE COURT: Thank you very much.

I will rule on the departure request.

I will not be departing downward in response to Mr.

Scholar's request. I do not believe that Ms. Williams has satisfied the requirements for a downward departure under 5H1.6. As the Second Circuit has held, "family ties and responsibilities are not ordinarily relevant in determining whether a sentence should be outside of the guidelines," in sentencing guidelines 5H1.6, "but if the circumstances related to those factors are extraordinary, a sentencing court is not precluded as a matter of law from considering them in making a downward departure." That's *U.S. v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991). And that quotes *United States v. Sharpsteen*, 913 F.2d 59, at 63 (2d Cir. 1990).

Mr. Scholar proposes that a departure is appropriate here because Ms. Williams's family ties and responsibilities are extraordinary based on statistics that he relays in his submission and here today. While the Court is sensitive to the hardship that will result if Ms. Williams is separated from her young daughter, the hardship here is the type that is unfortunately ordinarily incident to incarceration for similarly situated defendants. In other words, it is not uncommon for parents of young children to come before this Court for sentencing. The hardship of incarceration therefore means that the spouse or other parent has to take a greater role in caregiving, or another family member steps in. Here, Mr. Ricky Williams, Ms. Williams's husband, is, by all accounts, a loving and involved father to his daughter and is

capable of taking on additional child care responsibilities, especially with the strong community support that is evident from the letters that I have received.

The cases that are cited by Mr. Scholar involve more extenuating circumstances, such as where there is no other parental figure available to care for a young child. I do not find that the circumstances here qualify for a departure under 5H1.6. Even if I was authorized to depart under 5H1.6, though, I am not exercising my discretion to do so because, again, I find that the family circumstances are not so extraordinary as to warrant a departure. That's not to say that I won't be considering Ms. Williams's family circumstances in considering a variance or otherwise what a reasonable sentence would be in this case. I just find that it doesn't qualify for a departure under Section 5.

So, I have got my guidelines range here. After calculating them I now -- and I know that they are advisory. I now consider the relevant factors that are set forth in a statute 18 U.S.C. 3553(a) to impose a reasonable sentence.

So, I am going to start with the government, and then I will hear from Mr. Scholar, and any victims, obviously, and Ms. Williams, but let me start then with the government.

Is there anything you would like to say?

MS. STEINER: Yes, your Honor. Thank you.

As the government requests in its submission, the

government believes that a guideline sentence is appropriate in this case for a variety of the 3553(a) factors, including the seriousness of the offense, the need for specific and general deterrence, and the need to avoid unwarranted sentencing disparities with similar defendants.

I will start with the seriousness of the offense. Your Honor is very familiar with the conduct in this case having seen it over a nine-day trial. Clearly, starting with the conduct in New York, that conduct at the New York Planned Parenthood was very serious. It took place over the course of two days. Staff was threatened on a number of occasions, and also, one staff member was injured. And both doors of the facility were at various points fully blockaded by the defendant and others that she was associated with.

The Planned Parenthood victim statement outlines the significant impact of this serious conduct. I just want to direct the Court to that. As your Honor heard during the course of this trial, facilities like New York Planned Parenthood provide a plethora of different medical services, including abortion, but also including everything from cancer screening to pregnancy testing, STI testing, HIV testing, and they provide a significant service for the community. And the actions of the defendant on July 19 and July 20 of 2020 ground those services to a halt. And that location, just that one location, typically, on an average day, as came out during

testimony at trial, would see about 100 patients, has approximately 150 staff members that report to that facility. All of those individuals were directly impacted by the defendant's choices that day.

In terms of assessing the seriousness of the offense, however, under the 3553(a) factors, your Honor, it's also critically important that the Court look to the broader context of the defendant's activity with respect to other clinics at which she blockaded and invaded over the course of a two-year period. And here, I am referencing, your Honor, not just the New York incident, but also an incident that was introduced at trial, including abundant video footage of different blockades and invasions at Fort Myers, Florida; Atlanta, Georgia; and Nashville, Tennessee. I will summarize that conduct briefly here, your Honor.

In Fort Myers, Florida, this was in January 2022, the defendant directed a large group of individuals to blockade the two entrances to that facility. The head of security for the Fort Myers Planned Parenthood testified at trial that he had a significant concern that those individuals could have been armed. They came right up to the door of the facility. It was not a situation that was controlled, and posed a real danger to staff and patients. And as a result of that, he made the very unusual decision to lock down the facility, meaning no staff or patients could enter the facility to receive or render care.

At the Fort Myers facility, as Dr. De-Lin testified at trial, that had a direct significant impact on patients. Dr. De-Lin was supposed to treat approximately a dozen patients that day. Three of those patients, as she testified, were there for time-sensitive procedures, and any delay in care, which those patients did experience here, could have resulted in serious medical consequences. And the Court can and should take that into consideration here.

Moving on to the incident in Atlanta, in July of 2022, at the Atlanta Women's Center, there the defendant and others invaded that facility, meaning they entered the facility. One patient had to be removed from the waiting area and to be secured in another part of the facility because of the defendant's presence. And two other patients that were attempting to enter the facility were unable to do so to receive treatment and care. And that facility as well was placed on lockdown.

And, in addition, we have the activity shortly thereafter in Nashville, Tennessee, at the Planned Parenthood location, also in July of 2022, where the defendant posing as a patient attempted to enter the facility, got right up to the door of the facility, requiring the staff in the facility to shelter inside, and preventing patients from entering the facility.

Your Honor, this conduct is incredibly serious. It

had a real impact on victims, who here are the patients that were unable to receive care, and the staff members that were unable to simply do their job at all of these locations.

I will turn now to specific deterrence, your Honor, because I do believe there is a real need for specific deterrence in this case.

It became very clear through the evidence at trial that the defendant was not only engaging in this conduct, but was flaunting the justice system by repeatedly bragging on social media that she was, for example, willing to get arrested, that she would continue to do this activity, this criminal conduct, even if it meant that she would get arrested.

It's also concerning, frankly, your Honor, that the defendant's conduct over this two-year period did not subside, in many ways it escalated, from a blockade outside of the facility in New York, to even entering into a facility in Atlanta, and then attempting to get into a facility by posing as a patient in Nashville.

Specific deterrence is also important here because this is not the defendant's first case with respect to this conduct. We just discussed the arrest in Nashville, Tennessee in July of 2022. The government notes in its submission additional incidents following that date, where the defendant continued to invade facilities here in Brooklyn, New York, two different facilities. And there was also a consent judgment

entered in this district, the Southern District of New York, in April 2021, with respect to the defendant's activity at the New York Planned Parenthood that barred her from being in close proximity to that facility. And irrespective of these prior engagements with the court system, the defendant has proven that she was willing to continue to engage in this conduct.

Finally, I would note that this is the defendant's eighth conviction, not the first time the defendant has made contact with the criminal justice system. She received a 30-day sentence for her conduct in Tennessee. She otherwise has not received significant sentences, but such a sentence is clearly warranted here due to the need for specific deterrence, among the other reasons I have mentioned.

With respect to deterrence, general deterrence is also a significant consideration, your Honor. As your Honor is aware, all of the conduct that the defendant engaged in, both in New York and at the other clinics that I have mentioned, was live-streamed over her social media. With respect to the New York conduct, thousands of people were watching and paying attention to her criminal conduct. And those individuals that are watching, and I am sure many are watching the outcome of this case, need to know that they cannot engage in similar conduct without facing significant consequences.

And finally, your Honor, just briefly to touch on unwarranted sentencing disparities. As your Honor is aware,

FACE Act prosecutions are not abundantly common. The most recent slew of sentences occurred in the *Handy* case in the District of Columbia. There the court imposed rather significant sentences—a 57-month sentence for one of the protest organizers and leaders and a 34-month sentence for the other. There are strong parallels with that case, your Honor, in the sense that the defendant here was also an organizer; there, as here, the incident is live-streamed; there, as here, there was at least one staff member that was injured; and there, as here, medical care was unable to proceed.

This is an important case, your Honor. The government needs to bring cases such as this one to ensure that men and women in our community can continue to have free access to medical care, and the defendant through her actions, on repeated occasions, prevented individuals from accessing that care.

So, for those reasons, your Honor, the government believes that a guideline sentence is the only sentence that is appropriate in this case.

THE COURT: Ms. Steiner, just a couple of questions.

I see in the presentence report a reference to restitution. Is that being sought by the government here?

MS. STEINER: No, your Honor.

THE COURT: So the process for restitution set forth in the PSR on pages 35, 36, 37 I don't need to address.

MS. STEINER: No, your Honor.

THE COURT: Thank you.

At this point, before I hear from Mr. Scholar, do you have any victims who wish to make any statements here?

MS. STEINER: One moment, your Honor.

They are not present, your Honor. So we will rely on the victim statements submitted with our submission.

THE COURT: Thank you.

Mr. Scholar, I am happy to hear from you.

MR. SCHOLAR: Thank you, your Honor.

Your Honor, Bevelyn Williams is not the same woman today that she was in 2020. She is not the same woman she was in 2022. Since that time she has become a mother of a beautiful two-year-old daughter. And she has worked tirelessly to provide her daughter with everything she didn't have as a child, such as food, clothing, security, and that means everything to her.

I would submit to this Court that Bevelyn Williams has grown. And I would submit that even in the course of the evidence at trial, you could see the growth occurring from what happened in 2020, in the sense that she didn't seek to have contact, physical contact with any person at the protest. She remained yards away from the doors. It is conduct that the jury heard and acquitted her for. So we would ask that the Court, in looking at her growth, also take that into account.

The fact that knowing that she was pregnant indicated that she did not want to get involved in approaching a door because she knew that she had a daughter, or she knew she had a child within her. So that growth, her ability to make those distinctions, and see how that impacted not just her, but the overall community, I think is apparent even in the evidence that happened at trial.

THE COURT: So, Mr. Scholar, you're talking about, that was the Florida incident?

MR. SCHOLAR: That was during Florida.

So, if anyone stayed with Ms. Williams after the verdict in this courtroom, they would have seen a different Bevelyn Williams than what was depicted from a few seconds of videotape during the trial, regardless of the boisterous person that was there to draw attention to herself, to protest. Protesting, as we pointed out during the trial, especially in these circumstances, with respect to going to a location, knowing that there would be counter-protesters, knowing that these counter-protesters and protesters were going to come together in this mix, having to steel herself to go up to this location, being pushed by people, having umbrellas placed in her face, now that we know what her history has been, all of the events that have happened in her life, she will tell you today that it was a bad mix.

THE COURT: It was a bad?

MR. SCHOLAR: Bad mix. And I think that's the point of the mitigation report, indicating that these triggers, these things that have happened throughout her life, she probably wasn't even aware of these until these incidents happened.

But the person that was in the court after the verdict, she cried, she cried from the depths of her being. She didn't cry because she was fearful of going to jail. She lived with that reality for two years waiting for the case to go forward. And that's part of the growth that I was referring to.

So, Ms. Williams, she is a woman who grew up in abject poverty. She had to work since she was 13. She sustained some criminal convictions, and dare I say some of those convictions, I am not making an excuse for those convictions, but some of those convictions were sustained because she was just trying to find means to get food to eat. You have read the mitigation report. Her mother, even though she was there, all but abandoned her to seek other things. But I have heard it said that the most beautiful rose is the one that grows through the concrete. And that is Ms. Williams, thorns and all.

She has grown like that flower. She has abided by the Court's conditions of release since she has been indicted. She hasn't committed any other incidents. She has travelled without incident. The government hasn't indicated that she has committed any other incidents at any other clinics. And that's

growth.

She has had the opportunity to do media. TBN and Fox have clamored to interview her multiple times. If she was the same person, she would have done those interviews; she would have ranted against the system and maybe even insulted the jurors. But she didn't do that. She waited until today to tell the Court what was going on with her, what she was thinking and what brought her to this point.

Your Honor, the system that we all play a role in, it's not perfect. The guidelines are not perfect. The situation is not perfect. The person at the center of this is not perfect. But sometimes there is an expectation that perfect results can come about, and sometimes that's not possible. So I would ask the Court to maybe not aim for perfection, but to impose fairness, leniency and mercy.

We have submitted to the Court statistics that show that prison sentences show diminishing returns the longer they are. We would ask the Court to look at historically the role of women and the role of mothers in the criminal justice system. That prior to the guidelines, courts used their discretion and used that discretion more so for women and mothers, especially for mothers of young children. After the guidelines, the mandatory guidelines went into place, those sentences that were discretionary, they got merged with other sentences and the average was contemplated. However, women,

unfortunately, received the short end of that stick and were treated harsher than prior to the guidelines. After the removal of the mandatory guidelines, dare I say that in the last, at least, ten years there has been a trend towards individualizing the sentences to offense conduct as well as who the person is that comes before the court; not just giving a sentence just because the guidelines say so, or that's just what the court can do, but what is appropriate under the circumstances based on the person that comes before the court.

So we would ask the Court to use its discretion to temper justice with mercy, to impose a sentence outside of the guideline range. Obviously, we are asking for a sentence without any incarceration.

And just to conclude, Ms. Williams has grown up without suitable guidance, without a mother's love, left her to struggle and fight for every scrap. Even though that she had a father in her life, Ms. Williams ended up being tremendously starved. I would urge this Court to try to aim for a different result. And any leniency, any mercy is not for Ms. Williams per se, but for also her young daughter. And we would ask again that the Court not sentence her to incarceration, mainly because the defense submits that incarceration would be far greater than what is contemplated or necessary under these circumstances.

THE COURT: Thank you.

Can I just ask one follow-up question, which is talk to me a little bit about the deterrence element here. I have to consider deterrence and it's a significant factor that's weighing on my mind. So can you address that?

MR. SCHOLAR: Yes, Judge.

With respect to specific deterrence, from the growth that's occurred, the statements to the mitigation expert, her demeanor in court, the fact that she has been able to comport herself in the last few years without incident, specific deterrence, I would submit to the Court, is not necessary, incarceration is not necessary to do that. A sentence of probation or home confinement, which is a substantially harsh sentence also, could accomplish that.

With respect to general deterrence, I think with respect to the statistics that we have offered to the Court shows that, unfortunately——and we don't have a lot to go on because, as the government has indicated, these cases are not that prevalent, but with respect to just overall statistics, most cases are not affected by how long a prison sentence is. Most people coming into the system don't even list that as a reason that they gave in contemplating their actions.

With respect to the commission's own studies, the commission has found that, where judges have sentenced with leniency, outside the guidelines, that recidivism, especially with somebody who has a relationship, who has family, those

numbers are at the very bottom of people who come back to the system.

So we would argue that on specific deterrence, as well as general deterrence, that incarceration is not necessary for Ms. Williams.

THE COURT: Thank you, Mr. Scholar.

Before I hear from Ms. Williams, if she would like to say anything, I had one question for the government. There is a recommendation for a special condition regarding access to financial information and credit card payments, etc. Since the government is not seeking restitution, what is the government's position on those special conditions?

MS. STEINER: One moment, your Honor.

THE COURT: Sure.

MS. STEINER: Your Honor, for the special conditions that are listed, based on the fact that this was not a financial crime, as well as the fact that the government is not seeking restitution, the government does not believe that the first two special conditions need to be imposed.

The third condition I would just note is to allow the defendant to be supervised in her district of residence. And so the government would recommend that that continue to be imposed.

THE COURT: Thank you very much.

Ms. Williams, you don't need to say anything to me,

but if you would like to say anything, I am here to listen.

And you can stand or sit. Whatever makes you most comfortable.

THE DEFENDANT: Yes, your Honor. I would like to know, can I use the bathroom really quick?

THE COURT: Absolutely.

THE DEFENDANT: I am going to run right now and be back in three minutes.

THE COURT: In fact, if you want to use the one in the jury room, it's right there, and we will wait for a moment. Of course. No need to run.

(Pause)

THE DEFENDANT: May I stand here?

THE COURT: Sure. Absolutely.

THE DEFENDANT: So I know you have a list pretty much of my background that Calvin did, but I figured I would give you like a verbal storyline so that you can better understand.

So I was born in 1991. I was born into women's rights. You understand? I was pregnant at 15, and I got my first abortion. Be patient with me.

THE COURT: Take your time.

THE DEFENDANT: I got my first abortion when I was 15. I grew up in a broken home. I had a challenge in life. But I don't know if I was depressed, I don't think, I never experienced that, maybe lonely. But after I had my first

abortion, it took a toll on me. It was one thing to have sex outside of marriage, with a knucklehead young boy, just like me, and I did that because at the time my father wasn't around. But I think the icing on the cake is when I had the abortion. I didn't want it. It was three months and five days, and I didn't know what to do. I think at the time my dad was trying to protect me, and so he told me I didn't have a choice. He said, you have to go and get an abortion. And I was here in New York at the time. And I never forget. His girlfriend, he gave her an envelope full of money, and then she took me to go to the clinic. And I never forget this. It was people with picket signs outside and I thought they were crazy, loud, screaming. His girlfriend was, like, don't look at them, just look straight.

So I ignored them and I went in. I laid on the table. They gave me the sonogram. They told me how far along I was, but they wouldn't let me see. I remember asking, Can I see? And they said no. The next thing I know, I am waiting in the waiting room and it's time. I go to sleep, I wake up, it's done. But it wasn't done. You can't just pull something out, in my personal opinion, you can't cut something out of you without the emotional consequences that people have to face every day. And for me, that led me down a very, very dark road of depression. I remember my dad would look at me and he would say, What's wrong? And I'd just make up something because I

didn't want to talk about it. Then after the abortion, I found out the guy that I was pregnant by, he's got a whole another girl pregnant, I got a disease from the guy. I mean, you could imagine.

So life goes on. I'm living in a broken home. My mom to this day is a narcissist. God bless her. I just had to figure life out. You understand what I'm saying? My whole journey in life was having to figure it out on my own. And I always knew there was a god, but I honestly never fully gave my life over to him. You understand?

So, two more abortions later, living in New York, scamming. That's a big thing in my family. So on my father's side is a bunch of gangsters. And then on my mother's side, they scam. So, of course, I got to figure out how to make some money. That's the best avenue for me at the time. That's what I thought. And I landed in jail for seven days, and that is when I got my first felony. And I got five years' probation here in New York. I only did three and they let me go.

But when I went to jail, I was there for maybe three to four days. As soon as I came out, I pled guilty because I knew I was guilty. I didn't even waste the court's time. And then I ended up getting arrested twice for the same thing. But what people don't know is that at the time when I first got arrested, I was thinking in my mind, okay, how can I do the same thing but just not get caught? I didn't learn my lesson.

So then, now, when they come knocking on my door for the same thing again, it's the middle of the morning, I just got out of Rikers Island, that's when reality set in. When I was sitting in Rikers Island, I was, like, oh, girl, I'm not a criminal, this ain't for me.

So, they come knock on my door and they take me in again for the same crime. But in the meantime, my lawyer's trying to figure this out to get me out. But I had to be there. I met a lady in jail and this woman, she ministered to me, she spoke to my depression. She told me things that nobody else could know. She knew about the night I came home drunk, and I was in my room crying -- I was in the bathroom, actually, and I turned on the water and I just cried because I was just so miserable internally. And she told me about that night. I was, like, how could this woman know this? I'm running into this woman in Rikers Island. So when she told me that, I knew that was God speaking through this woman, and I had to make a choice. And so I did. I gave my life to Christ.

I'm gonna to tell you right now, I would have never thought for a second I would be standing in front of an abortion clinic. I was very selfish and very bougie. I could not see myself yelling and being outside in New York sun all day. Please. I would have never asked for that. But the lord just had my heart, he took my heart. It wasn't a typical come-to-Christ journey. It was really being broken and being

built by God and living it. It's one thing to petition for something, but you gotta live it.

There's a lot of black young girls like me who don't have a right avenue, and it seems like the role for wrong is so broad, it's so broad. And so I feel like it's a setup for failure, because my rights are protected as a woman to do what I want, what I think I want to do, even when it's wrong. But now the consequences that come behind it, which is that record that you see, which is the record that they see, that's the consequences I pay for my right, for my right, to do what I want to do, not for what's right, for my right.

And so, I don't blame them for judging me. I am loud. I am passionate. But am I violent? No. Back in the day, first of all, I wouldn't have leaped on the door. If I wasn't saved, I would have probably punched that lady in the face. And I'm just being honest. But I am saved. I wouldn't even have the heart to do something like that. I didn't go there with intentions to hurt that woman or anybody else. There's bigger fish to fry as far as I was concerned. I wanted to preach the gospel, and I wanted to use the message that God gave me because I lived it.

I'm not judging those girls that go in there ready to get an abortion. I know exactly what it's like. I know what it's like to be laying with a random guy, you got a baby and you trying to figure out life. I know what it's like. But I

know God. I know Jesus. And no amount of abortions would have gave me the heart that God gave me. No amount of my rights would have blessed me with the family that I have, and it's not blood. These people sitting there, they are my family because of Christ. So many people, of all races, all colors, band around each other, because we love each other. It's not because we hate abortion. Who am I to judge the next woman when I am three times over guilty?

And I have done so much more. My record is a joke. If you knew the things I did in private, God knows, God knows what I did. God forgave me. Jesus washed me. And I am so grateful, I am so grateful for him. And my passion, it doesn't come from wanting to yell at you or bully you. It's because I'm coming from a place in my heart where I see and I know. And I really didn't want to cry, to be honest with you. In my heart, I would have never wanted that woman's hand to be hurt. I would have never wanted that. And I'm sorry for that. I am sorry for her hand being locked in the door.

I'm sorry for my background. It's not fun to see that I am a criminal. That's not fun to hear. It's not. But I have a fear of God in me that goes beyond just this courthouse. When a person drops their wallet, once upon time I would have kept it. Not this Bevelyn. If a person is angry and upset at me, I never even knew back then I had the capacity to have a conversation and reason with someone. I didn't know I had that

gift. I have it now. There is so much about myself that I have seen and I have grown into as I have taken on this journey with Christ, and it has humbled me that I had to be this low, that I could never hold my nose up to anybody because I have been there.

This is my opinion, but I honestly feel like, had I continued to be a knucklehead criminal, I probably would have gotten a slap on the wrist. Your Honor, I feel like the Negro out of line. That's how I feel. I feel like, honey, don't get too loud, stay in your lane. I feel like it would have been better off for me to be the statistic that was spoken over me. I feel like I would have been better off as far as judgment goes. But as far as Christ goes in my life, he has taken me on a journey that I could never imagine, that I am not qualified for.

I mean, I couldn't imagine I would be talking to you about this. I'm so unqualified. But I just want you to know my heart and my intentions. And I understand actions come with consequences. I understand that. And I will respect them. I believe in my heart that any person in a position was erected because God put them there. I mean, you may have worked hard, I'm sure you had to, to be in that seat, but it had to be something that God put in you for you to even want it or desire it in the first place, because he must have had a plan for you to be here today.

So I am trusting you through God that whatever sentence you give me is what is needed, and I am going to honor it, and I am going to do what I have to do. I don't want to be away from my baby girl. No, I don't. I love her so much. And she is so special to me because she was the baby I didn't kill. You understand. So I want to be there for her, and she loves me very much. And I want to be there for my husband. After living a life of sin and being promiscuous, I ended up with a husband that loves me besides my loud and boisterous mouth.

So, yeah, that's what I would want. I ask for mercy, yeah, I do, but I will honor the Court, and I will honor you.

That's it. Thank you.

THE COURT: Thank you.

Thank you, Ms. Williams.

I take very seriously my role in imposing sentences. It's one of the most important things that I do. And I know that there's a lot of numbers that get thrown around in these sentencing hearings, but I am cognizant that every single day that I impose in terms of a prison sentence is significant. So I think very carefully before today, during today, about what sentence is appropriate here. And so what I am going to do, and I know it could be very hard to wait just a few more minutes, but I am just going to take a few minutes to think about what I heard today, and process that with what I have looked at before today, and then I will come back and give you

my decision. Again, I know it's hard to wait, I understand that, but I want to make sure that I take in everything that has been presented to me here today. So I am going to take a very brief recess, and then we will come back shortly.

Thank you.

(Recess)

THE COURT: Thank you for your patience.

As I mentioned previously, under 18 U.S.C. 3553, the Court is required to consider the nature and circumstances of the offense and the history and the characteristics of the particular defendant. I must also impose a sentence that is reasonable, sufficient, but not greater than necessary, to accomplish the goals of sentencing, which include the need to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, while avoiding unwarranted sentencing disparities among similarly situated defendants, to deter criminal conduct, and to protect the public, as well as to provide a defendant with needed education or vocational training, medical care, or other correctional treatment.

I have considered all of the sentencing factors as well as the advisory guidelines range. And some of my considerations include the following:

Ms. Williams is a 33-year-old woman. There certainly were challenges growing up. There was some abuse. She was

exposed to drug use. Her relationship with her mother was challenging, to say the very least, including where she was asked to work at various times in her childhood. She moved around a lot, did not have a stable home life. I do not need to get into all of the details publicly here about the challenges that she encountered growing up in order to respect Ms. Williams's privacy, but suffice it to say, I read that mitigation report very closely, and I took it all into consideration. There was clearly a lack of youthful guidance and significant difficult issues that Ms. Williams had to deal with growing up.

She does not have a history of mental illness, although some depression was noted after certain events in her life. She does not have a history of drug use, other than some sporadic and very brief use of marijuana many years ago. She obtained her GED and took some college classes. She is obviously a very smart person. She receives income from a business that she runs as well as from donations to At the Well Ministries. She is married to Mr. Ricky Williams, and they have a beautiful two-year-old daughter who I have heard much about. I did take her child care responsibilities into consideration here.

She has a very significant support network. I read every letter with care, and it is clear that many people love and admire Ms. Williams. She has helped many people. She

cares deeply about people and her principles. She has turned away, I believe, from the negative influences that were part of her childhood, and is trying to make a good life for her and her family.

I heard from Ms. Williams today as well. I really heard from her, and who she is, and her goal to be a good person and change the trajectory that occurred during her youth. But notwithstanding all of this, I cannot ignore the criminal behavior that brings us here today.

Let me move on to the seriousness of the offense. The events at issue here involve serious misconduct. Ms. Williams used force, threats of force, and physical obstruction to interfere with patients and staff who were seeking to enter the facility in New York City. She threatened to terrorize this place. She threatened war. She said that she was going to use any means necessary, and she did.

I watched the videos of the events over and over. There is no question in my mind as to what happened during those days. She obstructed entrances, she threatened people, and she used violence and physical force. Ms. Williams shoved people, including a Planned Parenthood security guard, who were trying to protect access to the clinic. She pulled a barricade away from a security guard and positioned herself at the door. She shoved a Planned Parenthood worker, Ms. Verrilli, to get closer to the door and screamed in her face, during COVID, in a

threatening manner. I find credible Mr. Lyman's testimony that she took a swing at a security guard.

And then, most importantly, I watched over and over the footage of the very disturbing incident where Ms. Williams tried to keep the door to the clinic shut when Ms. Verrilli was trying to escort a fellow volunteer into the building. Ms. Williams smashed Ms. Verrilli's hand in the door, and When Ms. Verrilli yelled that her hand was being smashed, Ms. Williams did not move. In fact, she sang "We Shall Not Be Moved." She continued to press the door closed on Ms. Verrilli's arm, and it took three people to pry the door open and get it off of Ms. Verrilli's hand. I can still see them pulling the door to try to free Ms. Verrilli's hand. And afterwards, Ms. Williams smiled at the camera. I did not see any remorse. This was no accident. And Ms. Verrilli's hand and arm were bruised and in pain for several weeks, requiring medical attention.

And all of this is because people were trying to give and get legal medical services, the many, many health care services that Planned Parenthoods provide. There are real victims here who were impacted. And I imagine that Ms. Williams knew exactly how this behavior would impact the patients trying to come into the clinic given her prior life experiences.

There is a way to protest for causes that you believe in, and people have a right to do that, but Ms. Williams

stepped over the line into criminal behavior, as the jury found. Quite simply, the Planned Parenthood events in New York City in June of 2020, to which Ms. Williams was found guilty, were extremely serious. And this is even independent of the actions taken by Ms. Williams in other jurisdictions, including Florida, Georgia, and Tennessee.

A significant punishment is also necessary to promote respect for the law. Ms. Williams's behavior and demeanor throughout the various videos that I saw evidences a blatant disrespect to the laws that protect reproductive health care clinics from obstruction, threats, and violence. She bragged about her behavior. She bragged that out of all the appointments that day, only one couple came into the facility. She live-streamed her flouting of the law.

I do not take issue with Ms. Williams's sincerely held religious beliefs. I absolutely believe that she has those beliefs, and I take no issue with that at all. But you cannot commit crimes even in the name of a religious cause. And whether Ms. Williams agrees with the law or not, it is a congressionally enacted law to which Ms. Williams and others must abide.

I want to just remind everyone, as I stated in my earlier opinion on this case, the act under which Ms. Williams was convicted does not just protect access to reproductive health care clinics. The act protects individuals' access to

reproductive health services and places of religious worship. In fact, Section 248(a)(2) similarly imposes liability when a person uses force, threats of force, or physical obstruction against a person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of worship. Quite simply, as Congress has directed, there is no place for the use of force, threats of force, or physical obstruction in either of these contexts.

In terms of providing a just punishment and avoiding unwarranted disparities among similarly situated defendants, I considered that FACE Act violations have resulted, although not numerous violations, but some have resulted in significant incarceratory sentences. In the *Handy* case in D.C., organizers of the disruption at the Surgi-clinic, like Williams, received 57 and 34 months. The events in D.C. resulted in a nurse spraining her ankle, akin to Williams smashing Ms. Verrilli's hand in the door and refusing to move as the door pressed against it. Most other defendants in the *Handy* case received substantial sentences of two or more years. I also considered the JSON data that showed that defendants sentenced under 2A2.2, with offense levels of 19 and criminal history categories of less than defendant, meaning II instead of III, had a median and average sentence length of 33 months. I obviously understand there are individualized circumstances that attach to each one of those sentences, but it's one of the

things that I looked at even modestly.

The Court must next consider deterrence. Specific and general deterrence are both important factors here. Ms. Williams publicly organized this event and encouraged and directed others during it. And I am talking about the New York City event. She live-streamed her criminal conduct. A significant sentence is necessary in order to provide general deterrence to others who are following this very public crime and may be considering like behavior.

Specific deterrence is also a very important factor here. Ms. Williams bragged that patients did not go into the clinic. She physically and violently obstructed doors and sang. She showed no remorse, as I said, after smashing Ms. Verrilli's hand in the door. She has expressed some remorse here, which I heard, that someone was hurt. And she is sorry for her past criminal behavior. I understand that. Even setting aside all of the other similar acts that she has taken at different health care clinics across the country, which illustrated that she gives no indication of being deterred from obstructing access to reproductive rights clinics, the need for specific deterrence is evident from the New York City incident alone and how she participated in it.

I also saw in the videos of her saying things at other locations: "This may be a year of a lot of arrests." And that she was "not afraid to get arrested." Those things show me

that Ms. Williams is not deterred from committing similar conduct even though there may be legal consequences, such as arrest, for committing a crime.

Quite simply, based on her activities, I am not convinced that absent a significant sentence, Ms. Williams would be deterred.

In addition, Ms. Williams has seven other criminal convictions, even though some are for quite some time ago and for relatively low-level offenses, but she has not been deterred from engaging in criminal conduct.

Protection of the public is also necessary here. Ms. Williams's violent and threatening behavior during the June 2020 events and lack of remorse at that time, or understanding that any of her behavior was hurting people, let alone her behavior at clinics over the years, shows the Court that she would not hesitate to engage in the same behavior again. There are real victims to such a crime and a significant sentence would protect the public from defendant engaging in the same threatening and violent behavior.

The seriousness here, the need for deterrence, and the need to provide respect for the law is further highlighted by Ms. Williams's conduct in Florida, Georgia, and Tennessee. To be very clear, I am not relying on acquitted conduct of illegal conspiracy for this sentence. Both parties have directed me to that conduct. Mr. Scholar to show that Ms. Williams has grown

from the days in which these incidents took place, and the government to show an escalation of her behavior. That conduct, unfortunately, shows to me a need for deterrence and to protect the public given that it continued.

Defendant may be a changed person now, as she says, and I actually don't doubt that, but as she has also recognized, actions must have consequences.

I considered the probationary and home confinement sentence that was requested by Mr. Scholar, and based on all of the foregoing considerations, it is simply not appropriate here.

I will now state the sentence that I intend to impose and the attorneys will have a final opportunity to make any legal objections before the sentence is finally imposed.

The appropriate sentence in this case is incarceration for a period of 41 months. This is squarely within the guidelines range of 37 to 46 months. And based on my consideration of the sentencing factors and the sentencing guidelines, I find that the sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing. I am not varying or departing upward or downward from that range.

To be clear, though, I would impose this sentence under 3553(a) even if the sentencing range were a lower range that defendant requests. A 41-month sentence is appropriate here, and a lower one would not be, given the defendant's

criminal history and extensive run-ins with the law, the significant need for deterrence, both generally and specifically, the prominence of Ms. Williams in organizing and directing others in this event, the continual use of violence in pushing the security guard and others to try to push through the barricades and block the doors, the violence used here to intentionally harm someone and crush Ms. Verrilli's hand, the significant sentences for other FACE Act defendants who are similar to Ms. Williams, and the bragging about how successful the events were.

Upon release from imprisonment, Ms. Williams is to be placed on supervised release for a term of two years. She shall be subject to the following mandatory conditions of supervised release that are set forth in the presentence report at page 33.

She must not commit another federal, state or local crime.

She must not unlawfully possess a controlled substance.

I am not going to impose the drug testing condition based on the Court's determination that she poses a low risk of future substance abuse.

She must cooperate in the collection of DNA as directed by the probation officer.

And she must comply with the standard conditions that

have been adopted by this Court.

Speaking of the standard conditions -- and again, I find that she has a low risk of substance abuse given that she has not smoked marijuana for years, and even when she did, it was not extensive.

With respect to the standard conditions of supervised release, I will be imposing them exactly as written in the PSR at pages 34 to 35.

Mr. Scholar, would you like me to read those conditions out loud or do you waive the reading of the standard conditions?

MR. SCHOLAR: We would waive it, Judge.

THE COURT: Thank you.

I am not going to impose the special conditions that were suggested by probation other than the special condition that she be supervised by the district of residence.

The fine owed by Ms. Williams is waived because of her inability to pay.

Is the government seeking any forfeiture?

MS. STEINER: No, your Honor.

THE COURT: And no restitution, correct?

MS. STEINER: Correct, your Honor.

THE COURT: I will also impose a special assessment of $100.

Ms. Steiner, do you know of any legal reason why this

sentence should not be imposed as I have stated it?

MS. STEINER: No, your Honor.

THE COURT: Mr. Scholar, do you know of any legal reason why the sentence that I have stated should not be imposed?

MR. SCHOLAR: No, your Honor.

THE COURT: Thank you.

Mr. Scholar, do you have any requests for a designation?

MR. SCHOLAR: Yes, your Honor. We would ask that Ms. Williams be housed as close to her home in Tennessee to be close to friends and family. And we would also ask the Court to consider recommending her for the RDAP residential treatment program.

THE COURT: Can you talk to me about why the RDAP program, given that I don't see any history of substance abuse?

MR. SCHOLAR: As the Court indicated, she has had some issues with marijuana in the past. And just with respect to the statistics that we supplied during the submission, with respect to getting access to treatment, mental health treatment being what it is in the Bureau of Prisons, we would ask that the Court recommend her for that program so that she could get some further guidance with respect to refraining from drug use.

THE COURT: What is the government's position on that?

MS. STEINER: Your Honor, the government would oppose

a recommendation for RDAP. As the Court noted a moment ago, the defendant has no recent history of drug use, so much so that the Court declined to impose a drug testing condition. The RDAP program is meant to permit inmates an opportunity with a prior, more recent drug history to engage in treatment with a potential consequence of receiving less prison time. That program is appropriate for defendants that do have a drug history and a recent drug history. That's not the case here, your Honor.

THE COURT: Thank you.

I will request that the Bureau of Prisons place her in a facility that's close to her home in Tennessee. As you have probably explained to your client, I can't require that, I can simply recommend that, which is what I will do.

I am not going to request the RDAP program, but I will request that she placed in a facility that has some mental health counseling as well so that she can take advantage of that.

Anything else you would like to say about that, Mr. Scholar?

MR. SCHOLAR: No, your Honor.

THE COURT: Thank you.

Mr. Scholar, do you request voluntary surrender? I see that the probation officer sees Ms. Williams as a good candidate for voluntary surrender given her compliance on

pretrial supervision.

MR. SCHOLAR: Yes, your Honor.

THE COURT: What is the government's position?

MS. STEINER: No objection.

THE COURT: I agree with that, and I will have voluntary surrender in this case. I find that Ms. Williams has been perfectly compliant on pretrial supervision, and I don't see any need for remand at this time.

I would suggest and I will order that she surrender for service at the institution designated by the Bureau of Prisons——I will put 60 days out——before 2 p.m. on October 16, 2024, or as notified by the pretrial services department if it's an earlier or later time.

Ms. Steiner, does that work for you?

MS. STEINER: Yes, your Honor.

THE COURT: Mr. Scholar.

MR. SCHOLAR: Yes, your Honor.

THE COURT: The release conditions that Ms. Williams will be on are the same as previously established, and they will continue to apply, and I must mention that failure to report for service of a sentence is a criminal offense.

Ms. Williams, you have the absolute right to appeal your sentence. If you're unable to pay for the costs of an appeal, you may apply for leave to appeal *in forma pauperis*. You may also apply for court-appointed counsel. The notice of

appeal must be filed within 14 days of the judgment of conviction.

Is there anything else, Ms. Steiner, any other objections, any other issues, anything more that I need to address here today?

MS. STEINER: Not from the government, your Honor. Thank you.

THE COURT: Mr. Scholar, the same question. Any other issues, objections, anything else that I need to address here today?

MR. SCHOLAR: No, your Honor.

THE COURT: Thank you.

I know this is very hard, Ms. Williams, but you are young and this mistake does not need to define the rest of your life. And I am very hopeful and confident that the significant support network that you have had throughout this will continue with you and that you will move forward on a positive path.

This Court is adjourned. Thank you.

(Adjourned)